The Ingber Law Group
Jason M. Ingber (SBN 318323)
3580 Wilshire Blvd., Suite 1260
Los Angeles, California 90010
T:310-270-0089
E-mail: ji@jasoningber.com

Attorney for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

Jorge Tapia Plancarte, Alejandro Nunez, Alex Williams, Alexandra Sierra, Asan Sapenov, Billy La, Danny Gallegos, Dennis Benko, Dinar Muratov, Edward Mitoma, Glenn Caro, Jessyka Mathews, Jesus Perez, John Llanos, Jose Escobar, Kevin Lively, Kim Chan, Kuldeep Dhaliwal, Kynan Barrios, Minerva Alcala, Mozhgan Samiei, Nasreen Suleman, Navid RezaKhah Khadem, Ramzan Madaev, Ravi SeKhar Menta, SriKanth Reddy Terupally, Shawn Hall, Timothy Johnson, Vitali HaradzetsKi, Will Plummer, Edgar Arnott, Roman Oulko, Gary Alan Curiel, Kayla Rodriguez, Richard Yap, Ahmad Razavi, Peter Robert Nichols Jr., Leonel Diaz, Ann Thomas, Brian Elliot Turnauer, Signe Kiesel, Lonnie Sarcos Jr., Hannah Baker, Charles Wolff, William Viteri, Kendra Neuberger, Zachary Sherry, Veronica Delgado, Seema Khadim, Margarita Camarena, Christine Gellel, Judy Hwang, Deven Perkins, Juan Hernandez, Sairoong Anne Kim, Dietra Yvonne Hill, Rosa Rodriguez, Hector Palominos, Enrique Silva, Daniel Rodriguez, Katherine Breslin, Petr Perminov, Suzanne Bash, Rajesh Mahat, Jason Boatright, Philip Pang, Angela Zamora, John Ho, Kevin Williams, Hadeel Alarqan, Robert Watkins, Robert Adamson, Leticia Morales, Brian Martinez, JoAnn Trotter, Hyung Ah Kim, Aleksey Oulko, Bill Citelly, Candice Hemsley, Mohammed Aledlah, Larry Jung, Rhina Reese, Vince Rodriguez, Akbar Saidakramov,

Case No.:

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**

- 1 -
**CLASS ACTION COMPLAINT**

Nanci Lisseth Saidakramov, Jose Luis Perez, Oscar Lucas, Pier Angela Ali, Javed Ahmad, Stephanie Hardesty, Wolf Wigo, Siddhartha Sharma, Christopher Cruz, Elizabeth Rhodes, Aaron Gates, Wesley Johnson, Danielle Pigneri, Lidia Mendoza, Erika Berenice Rosas Ramirez, Hugo Aguilar, Saud Chaudhry, Samuel Antonio D'Anna, Pedro Martinez Sanchez, Michael Hernandez, Khuong Phamdang, Jose Lopez, Josh Choi, Ryan Cessna, Erika Cessna, Maria Carillo, Jose Huerta, Denise Artukovich, Darren Jireck, Youngjin Kim, Glenys Lisseth Caro Ramos, Chenaniah Wondercheck, Jennifer Do, Miguel Mendoza, Francisco Calzada, Afroza Haque, Grant Davis, Deisy Espinoza, Christina Leno, Jose De Jesus Vazquez Garcia, Trina Marie Innocenzi, Mariela Rodriguez, Bertha Briseno, Feliciano Guzman Moreno, Jessica Bui, Andi Woo, Matt McElearney, Amir Mohebbi, Issam Eljamal, Jackie Kolpa, Ivan Tapia-Rodriguez, Oscar Javier Tolentino, Jorge Perez de Tagle, Shayan Shahidi Zandi, Raul Ulloa, Michael Choyce, Robert Ferdan, Surya Iyer, Luis Padilla, Mehdi Mahmoodi, Mo Said, Jenny Ruiz, Azzam Yasseen, Maria Rodriguez, Kyle Domenic Cayce, Amanda Reeves, Luilly Martinez, Virginia Cruz, Ye Lu, Quentin Wu, Guadalupe Avalos, Saeid Eshraghi Tehrani, Leonid Pasechnik, Elodia Trabelsi, Kenneth Contreras, Abraham Rodriguez, Ang Li, Alejandro King, Takumi Noh, Silvestre Solano, Joanne Qiu, Jose Avalos, Seoungwan Noh, Luz Myriam Montanez Lara, Mark Fisher, Miguel Angel Goyes, Albert Russ, Brian Joseph & Sophia Lovina Eagan, Hye Suk Sung, Tom Chung, Rhiannon Leal, Delmira Pellum, Vien Lam, Nina Cheska Serrano Makalinaw, Goel Yazdinian, Chongnian Tan, Hyoung Kiun Lee, Xi Yang Huang, Pamela Zhao, Maria Luisa Aleman Da Silva, Caroline Carillo, Abdela Bouhedda, Maxim Safonov, Sahil Alam, Jeff Carta, Denise Rosales, Archie Berkom, Paul Van Holton Berkom, Quang Mai, Jonathan Dela Paz, Arturo Mendoza, Chih Hsuan Lin, Dennis Eaton, Angela Eaton, Josh Hoang, Jacqueline V. Illera,

- 2 -

**CLASS ACTION COMPLAINT**

Manuel Moumdjian, Larry Dale Costello, Tatsuhiro Sugihira, Francisco Iglesias, Leonardo Flores, Mohammad Naderi, Quang Lam, C.M. Djavaheri, Chrystal Lee, Arthur Bartholomew, Thu Huynh, Jason Bryan Fong, Bimal Kansagra, Peter Mbonu, Eva Perez, Albert Young-Keun Park, Jose Ruiz, Utpala Bhalodia, Henry Cheuk Wah Li, Leonor Vasquez, David Gonzales, Rob Triplett, Zabastian Amadeuz, Haad Mahmood, Erick Shahnazari, Ali Feghhi, Prakash Prajapati, Paul Dayao, Tracey Adcock, Efran Malakouti, Lorena Campos, Fabian Marin, Hossein Feghhi, Mustafa Hassan, Luis Jurado, Mark Brown, Anthony Maxey, Hung Do, Taho Duong, Jacob Duong, Thanh-Minh Tran, Nancy Tran, Ade Oyebade, Sylvia Alonso, Neil Erwin De Jesus, Jennifer Do, Mischana Arnold, Daren Camargo, Revaz Matsiashvil, Christopher Garcia, Ruben Ornelas, Apollo Maquiling, Jagdish Shah, Divina Novelo, Akesh Sheth, Morni Shah, Joseph Hilson, Shailesh Desai, Sandra Silva, Shweta Shah, Ramesh Jhaveri, Vijay Shah, Kyla Burke, Julio Aguilar, Araceli Aguilar, Prasad Romijn, Abby Trowbridge, Sachie Monastiero, Juan Carlos Berumen Miranda, Kishor Sanghvi, Joe Lin, Dipak Shah, Daksha Mehta, Illuminada Baylosis, Hemant Shah, Patrick Metzker, Timothy Stemler, Vipinchandra Vadecha, Shaun Finn, Chani Rubin, Felipe Cardenas, Julie Membreno, Yogesh Shah, Belen Villasenor, Ashvin Sheth, Dan Rubin, James Panozzo, Jorge Garciarosell, Gaddoor Saidi, Anthony Smiroldo, Ramin Shirazi, Alcides Caceres, Maria Sandra Escamilla, Enrique Escamilla, Michael Portalatin, Brandon Ngueyn, Amelia Valdez, Steven Collins, Jose Luis Jauregui, Jiyun Seo, Angela Schechinger Kevork Balkian, Robert Kang, Beth Gawreluk, Noel Castro, Elsy Nohemy Perez Borja, Greg Rom, Eric McCall, Junyu Miao, Zach McCall, Francine Williams, Maria Regina Surio, Moosa Harasis, Ritesh Desai, Dimitri Kermani, Ivan Sanchez, Romano Matic, Mikaela Lanan, and Mario Zepeda, Enrique Perez, individually and on behalf of all others similarly situated,

- 3 -

**CLASS ACTION COMPLAINT**

Plaintiffs,

vs.

Toyota Motor Sales, U.S.A., First Element, Inc. a California corporation, Toyota of Tustin, and Toyota of Glendale, Toyota of Santa Monica, Long Toyota, Toyota of Tustin, Toyota Motor Credit Corporation and DOES 1 through 5, inclusive,

Defendants.

Plaintiffs, individually and on behalf of others similarly situated, allege against defendants Toyota, in its manufacturer and seller capacity via its dealers, and its alter ego First Element, Inc., and DOES 1 through 5 ("Defendants") as follows:

**TOYOTA VIOLATES ITS ORIGIN PRINCIPLES FOR FRAUD & PROFIT**

1.      Toyota has lost its way.  What started as a family business has evolved into a capitalistic global monster that chokes entire markets and ignores their own customer pleas for mercy.  Customer complaints by the tens of thousands are lodged with Toyota about their hydrogen car and nonexistent fuel infrastructure, with concurrent single-plaintiff and class action lawsuits that detail the agony consumers suffer; Toyota ignores these cries to further its naked restraints on trade.

2.      Sakichi Toyoda founded Toyota.  He invented the Toyoda wooden hand loom in a backyard shed, mainly to help his mother, who would weave in their home.  Sakichi Toyoda invented the world's first machine powered loom in the late 1800's.  Sakichi Toyoda developed an unwavering conviction that a product should never be sold unless it is carefully manufactured and fully tested in a commercial trial, with completely satisfactory results.[1]

---

[1] See Toyota Industries Corporation, https://www.toyota-industries.com/company/history/toyoda_sakichi/index.html (last visited September 25, 2024); see also, https://www.asahi.com/ajw/articles/14839774#:~:text=Toyota's%20beginnings%2

**CLASS ACTION COMPLAINT**

3.      In the early 1900's the company opened an automobile manufacturing plant and adopted guiding principles.  According to Toyota, the first principle is "Respect for the Law" and specifically, "Toyota Industries is determined to comply with the letter and spirit of the law, in and outside of Japan, and to be fair and transparent in all its dealings."[2].  According to Toyota another founding principle is "*Genchi Genbutsu* (English: Go and see for yourself): The best practice is to go and see the location or process where the problem exists in order to solve that problem more quickly and efficiently."[3]

4.      In the 1900's Toyota enjoyed automobile sale success, and by the early 1980's Toyota began a concerted effort to sell luxury cars to the U.S. market.

5.      Legend has it the acronym behind Toyota's luxury brand Lexus is **L**uxury **Ex**ports to the **U**nited **S**tates.  After exhaustive testing, Toyota sold luxury sedans in the U.S. and opened numerous manufacturing plants in the U.S.

6.      Toyota has enjoyed its pounds of flesh from U.S. consumers and now chomps on the hand that feeds them.  Recently, Toyota lobbied the California government for resources to develop a hydrogen fuel car.  Toyota put this defective car on the roads with inadequate field tests and fraudulent marketing.

7.      Toyota's scam wasted $100 million in California taxpayer money.

8.      Toyota leveraged its market position in California to create a monopoly that allows them to control prices and restrain competition.

**TOYOTA CONTROLS THE DIRTY FUEL NETWORK THEY BUILT**

9.      In litigation where customers state they're unable to find fuel for their hydrogen car, Toyota chooses to point fingers of blame at the fuel providers. Toyota's position is that they can't control the fuel providers.

10.     Toyota is lying.  Toyota is in total control over the entire fuel network.

---

0were%20humble.,start%20building%20cars%20in%201933, last visited September 25, 2024.

[2] See, https://www.toyota-shokki.co.jp/company/item/Corporate_Profile_2024_E_view.pdf, last visited September 25, 2024.

[3] See, https://mag.toyota.co.uk/genchi-genbutsu/, last visited September 25, 2024.

**CLASS ACTION COMPLAINT**

11.     Toyota and its, a foreign parent company, colonized California's hydrogen fuel market for their own benefit and have and continued to abuse it. Toyota created California's unreliable ***dirty*** *hydrogen* fuel infrastructure from ground zero.

12.     Here's the landscape that reveals Toyota has absolute U.S. hydrogen fuel car market dominance: in the United States, hydrogen fueled light duty vehicles are only sold in California. Toyota has sold over 20,000 hydrogen powered cars in California versus a total 700 hydrogen powered cars sold by Hyundai and Honda.  Consequently, Toyota is the undeniable leading stakeholder in the California hydrogen fuel market with over 95% market share.

13.     Toyota's unchecked market dominance is pernicious. Here's one quick flagrant example: Toyota chose to build hydrogen fuel pumps predominantly in rich neighborhoods and they mostly sell the car to low-income folks, making it arduous for their actual customers to obtain fuel.[4]

### TOYOTA ATTACKS A CALIFORNIA PUBLIC UNIVERSITY

14.     California State University, Los Angeles ("Cal State") applied for a California state grant, so that Cal State could build a *clean hydrogen* fuel station.[5]

15.     A grant was awarded around 2010, and construction began!

16.     Cal State quickly faced issues as to pumps' irregular pulsation in its early construction phases, and so, Cal State hired Michael Dray as the station and project manager.[6]

17.     It took Michael Dray over a year to fix the pumps' pulsation issue.

---

[4] In 2014 Toyota publicly stated: "The issue of hydrogen refueling infrastructure is not so much about how many stations; but rather, location, location, location," stated Bob Carter, senior vice president, Automotive Operations, Toyota Motor Sales. (See, https://pressroom.toyota.com/toyota-firstelement-financial-assistance-hydrogen-refueling-network-california/, last visited September 26, 2024).

[5] Toyota extracts hydrogen from methane, which generates emissions worse than conventional gasoline vehicles. For every kilogram of hydrogen they extract, 12 kilograms of carbon dioxide—***the very gas choking our atmosphere and accelerating the planet's demise***—belches into the sky. Cal State LA extracted hydrogen from water using renewable energy with *a method that leaves zero harmful gases released to the environment.*

[6] Please see attached **Exhibit A**, a signed sworn statement of Michael Dray, Esq.

- 6 -
**CLASS ACTION COMPLAINT**

18.    Cal State was approved by the California Division of Measurement Standards (DMS); Cal State earned a seal of approval from the DMS for their pumps.

19.    Cal State's hydrogen fuel station earned this seal of approval by passing rigorous tests for accuracy as to amounts dispensed and charged to customers; fire system protections, etc.  In sum, Cal State had a literal seal of approval from the state of California to sell hydrogen to the public.

20.    Cal State continued to test their pumps and in 2011, Cal State internally agreed that their fuel pumps were safe, and ready for public use.

21.    Many vehicles began to fuel at Cal State's *clean hydrogen* pumps.

22.    After the DMS awarded approval, the Cal State's pumps were added to the website, h2fcp.org/stationmap; the website holds itself out to provide real time maps for open hydrogen stations, so drivers know where they can refuel.  The website h2fcp.org/stationmap is a main source for hydrogen fuel car drivers to know where they can fuel their cars.

23.    This h2fcp.org/stationmap website is officially run by a weird creature called the Hydrogen Fuel Cell Partnership.

24.    The Hydrogen Fuel Cell Partnership is a weird creature because it's a quasi-governmental entity that is truly run by Toyota.

25.    Shortly after Cal State was added to h2fcp.org/stationmap informing drivers they could fuel at Cal State, Toyota forced the Hydrogen Fuel Cell Partnership to remove Cal State's fuel station off the h2fcp.org/stationmap.

26.    Michael Dray represented Cal State on a conference call with the Hydrogen Fuel Cell Partnership about Cal State's removal from the website.

27.    On this conference call a man named Spencer Quan, an engineering consultant that worked for Toyota said, "it takes a lot of guts to say your [hydrogen station is] open to the public." To which Michael Dray responded, "but we are." And Spencer Quan replied, "no you're not, because Toyota vetoes that."

**CLASS ACTION COMPLAINT**

28.    Before and after that conference call, Spencer Quan ratcheted pressure on the Hydrogen Fuel Cell Partnership, and the California Air Resources Board, to remove Cal State's fuel station from h2fcp.org/stationmap.

29.    Michael Dray received intense pressure from personnel with the California Air Resources Board to force him to agree to be removed from h2fcp.org/stationmap.

30.    Michael Dray resisted this removal off the website, because as a taxpayer, citizen, and public employee, he knew that it was in the public's interest that Cal State's $6 million *clean hydrogen* station paid for by California taxpayer and philanthropic money be available for public use and known to the public.

31.    It became explicit that if Toyota would not approve Cal State's *clean hydrogen* station, then Cal State would have no customer base anyway, so Michael Dray acquiesced to be removed from the website, with an agreement that Toyota would visit Cal State's *clean hydrogen* station and eventually approve it and put it back on the website.

32.    Over the next five years Honda and Hyundai allowed the use of Cal State's *clean hydrogen* station for its drivers, but Toyota refused to approve the station for its drivers or <u>ever</u> visit.  This violates Toyota's own principle "*Genchi Genbutsu* (English: Go and see for yourself): The best practice is to go and see the location or process where the problem exists in order to solve that problem more quickly and efficiently."[7]

33.    Toyota controls its customers through the fuel card that they provide drivers for hydrogen fuel. These fuel cards are debit cards that are provided to customers that purchase the Mirai and are financial instruments that Toyota controls. Toyota did control the cards by blocking them from working at Cal State's pump.  Thus, Toyota blocks their customers from using stations they don't

---

[7] See, https://mag.toyota.co.uk/genchi-genbutsu/, last visited September 25, 2024.

**CLASS ACTION COMPLAINT**

approve of with the "free" hydrogen fuel cards they lure their customers into purchasing a Mirai.

34. Another way Toyota controls their customer drivers is Toyota threatens to void the warranty if they fuel up anywhere besides their approved stations. Toyota also will void a customers warranty if they get their Mirai serviced anywhere besides a few select Toyota dealerships.

35. Back to the Cal State saga: Toyota attacked Cal State's *clean hydrogen* station in more ways.

36. Toyota retroactively imposed a new fueling standard called SAEJ2601.

37. This new fueling standard SAEJ2601 was intentionally unrealistically high. This was admitted to Michael Dray by an engineer named Jesse Schnieder.

38. Mr. Schnieder was a member of the committee that pushed the retroactive prohibitive fueling standard.

39. Then Mr. Schnieder did nothing about it for the same reason no one did anything to argue with Toyota, because people were afraid of Toyota.

40. Toyota's grip became so nefarious that numerous individual hydrogen station owners had a meeting to discuss what to do about Toyota's ironclad control and retroactive new standard, and at that meeting Michael Dray suggested that the station owners form an association, and the CEO of First Element agreed with Michael Dray.

41. Nothing ever came from that meeting.

42. Shortly after, Toyota loaned First Element over $25 million.

43. Consequently, the largest hydrogen fuel station operator in California, with over 50% of the market share, is, and was beholden to Toyota financially, as a debtor. For the purposes of this case, First Element is an alter ego of Toyota.

- 9 -
**CLASS ACTION COMPLAINT**

44.    From that point on, First Element (i.e. True Zero) stations were instantly approved, and added to h2fcp.org/stationmap overnight as they were built, but not Cal State's *clean hydrogen* station and other private pumps.

45.    When Toyota first came out with this new retroactive SAEJ260 standard, Toyota said they won't use it as a hammer, and it would serve only to enhance performance. Toyota did the exact opposite.

46.    Toyota forced Cal State to spend millions of taxpayer dollars over the years, to meet a standard that was nonexistent when Cal State's *clean hydrogen* fueling station was built and approved by the state and other car manufacturers.

47.    Cal State spent years and millions to meet Toyota's never-ending demands.

48.    Cal State changed the electronic programming of the fuel dispensers to improve the tanks' chiller per Toyota's request.

49.    Cal State hired an engineer that worked for NASA's Jet Propulsion Laboratory to help meet new requests from Toyota, which were all done exactly per Toyota's specifications.

50.    Throughout this time, Honda and Hyundai continued to allow their drivers to use Cal State's *clean hydrogen* fueling station, but Toyota did not.

51.    The harassment and threats by Toyota increased.

52.    Toyota, in meetings with their engineers, and Michael Dray and his consulting engineers, threatened to have the California government shut down the Cal State LA's *clean hydrogen* fueling station, if the university didn't jump through all their hoops.

53.    Toyota complained about the Cal State's fuel station hours of operation.

54.    Cal State wanted there to be a limit, so that the university could afford to always have an attendant present to help people refuel, as refueling hydrogen is not intuitive, and, even on a good day, a station will glitch.

**CLASS ACTION COMPLAINT**

55.    Toyota refused that line of logic, and required Cal State to keep their fueling station open 24/7 with no attendant present.

56.    Toyota insisted that a credit card reader be installed in the pumps even though the station had a card reader (paid for by tax payer money) that worked just fine in their office and had capacity to accept Toyota's fueling cards, however Toyota continued to block Cal State from h2fcp.org/stationmap or allow the university to sell fuel to its customers.

57.    Michael Dray installed a credit card reader into the fuel dispenser which took over a year and copious taxpayer money. Toyota continued to refuse to approve Cal State LA to rejoin h2fcp.org/stationmap.

58.    To meet SAEJ2601, Cal State's fuel station was forced to undergo rigorous testing.  However, a device to test this impractical standard did not exist, and Cal State had to commission a device to test their own fueling station as to the new retroactive standards.  Cal State created said testing device to test moisture levels as requested by Toyota.

59.    Again, Toyota never, not once, visited to check on all these tests. Instead, they lobbed endless new demands on Cal State.

60.    Toyota imposed these retroactive standards on other stations as well.

61.    So, contrary to Toyota's comments that the retroactive standard SAEJ2601 wasn't going to be used as a weapon, Toyota indeed weaponized the retroactive standard.

62.    Around this time, it became clear that no existing fueling station could meet the retroactive standard.  Yet, new True Zero stations were automatically approved.

63.    Toyota finally said they have no problem with the technical performance of Cal State's fueling station however, now Toyota became concerned with the Cal State's station's capacity because Toyota stated it was too

- 11 -
**CLASS ACTION COMPLAINT**

small, as it could only fill 20 cars a day. So, Toyota began to demand to see the Cal State station's maintenance plans and parts that it kept in inventory.

64. Michael Dray provided all these to Toyota, and still they refused to approve the Cal State station to be on h2fcp.org/stationmap, or allow their drivers to fill up at the Cal State's station.

65. Throughout these years, many Toyota Mirai drivers would pull into Cal State's station and for fuel and Michael Dray had to turn them away.

66. People would drive in with kids in their car with desperate begging because two or three other hydrogen stations they went to that day didn't have any hydrogen fuel and Michael Dray had to send them back on the California highway with little or no fuel.

67. After years and years and years of moving goal posts, Michael Dray went to a meeting with the Fuel Cell Partnership at the headquarters of Honda in Torrance, where again Toyota publicly resisted providing their approval to Cal State for the website even though Honda and Hyundai allowed their customers to use the university station for years and had repeatedly openly approved of the university fueling station.

68. At that point, Michael Dray went to the state of California Governor's Office of Business and Economic Development (GO-Biz) and said to Tyson Eckerle, the department's Senior Advisor for Clean Infrastructure and Mobility, that taxpayers paid for the Cal State *clean hydrogen* fueling station and the taxpayers suffer an almost decade long fraud.

69. Michael Dray threatened that if the university station was not approved immediately for h2fcp.org/stationmap and for use for Toyota customers, then he would go to the energy committees legislator with these fraud details. Shortly thereafter, Cal State's fueling station was approved by Toyota.

**CLASS ACTION COMPLAINT**

## TOYOTA POLLUTES CALIFORNIA WITH DIRTY HYDROGEN

70.    Why did Toyota target and thwart Cal State LA's fueling station for over seven years?

71.    One reason for the targeted harassment to the university was because the university was one of the only stations making *clean hydrogen* i.e. producing hydrogen from water.

72.    Toyota decided from the jump that a green process was not profitable.

73.    Toyota decided they were going to produce hydrogen fuel from methane.

74.    Toyota wanted to chill competition, innovation and environmental minded hydrogen makers with its fueling standard and bullying of hydrogen makers that didn't work for them.

75.    This is a major betrayal to California taxpayers.

76.    *Dirty hydrogen* production emits large amounts of $CO_2$, even if the hydrogen car itself produces zero emissions.

77.    Toyota's hydrogen push is a scam, a monumental deceit crafted to ensure their continued stranglehold on energy production.

78.    Toyota forces the hand of the market, creating fleets of hydrogen cars powered by *dirty hydrogen*—cars that claim to emit zero pollutants at their tailpipe but leave a trail of destruction at every stage of fuel production and are overall worse than electric or gas cars.

79.    Toyota argued for years and to this day that the production of hydrogen fuel from fossil fuels was only a temporary step to bridge the gap to producing hydrogen from water.  But it's been decades of these promises and still hydrogen fueled cars pollute the environment more than gas powered cars.

80.    Toyota continues with their marketing saying Mirais are zero emission vehicles! And it's the best deal on the planet! Behind the scenes they engage in

- 13 -
**CLASS ACTION COMPLAINT**

carbon credit purchases and layers of nefarious control to hide how bad their hydrogen push is for the environment.

81. True Zero, which is owned by First Element and controls the most hydrogen stations in California advertises on their website to this day (and likely tomorrow and the next day and the day after) boldly: "Filling up your hydrogen vehicle is as easy as filling up a vehicle with gasoline or diesel fuel – only cleaner!".

82. It is a complete lie and misrepresentation to juxtapose filling up a car with hydrogen to gas.

83. For one, hydrogen fuel is more complicated than filling a car with liquid fuel by many multiples.

84. More practically, the points of failure, temperature fluctuations during different times of the year, and innumerable other mechanical workings all contribute to a much longer than five minute fueling period for consumers.

85. The desire to market the hydrogen fuel process like gas is what drives Toyota and their actions. Toyota neglected to tell drivers of the difficulties associated with fueling from hydrogen stations and their ever-increasing retroactive regulations on hydrogen stations they were imposing.

86. Toyota has a hydrogen market playbook. Toyota has inflicted this playbook on other countries like Denmark, Scandinavia, and Germany, where you will find hundreds of abandoned Toyota Mirais and inoperable hydrogen stations collecting mothballs:

1) Toyota sells a government with a fraudulent bill of good that premised on a promise to make a greener future;

2) Toyota provides hydrogen fueled cars to key local politicians for free and lobby aggressively for taxpayer money;

3) Toyota enjoys revenue and customer data and hydrogen data it sucks up from their cars, customers and stations;

**CLASS ACTION COMPLAINT**

4) Toyota abandons the hydrogen infrastructure and points fingers at everyone but themselves and leaves.

87.   California citizen's green hearts and immense car market both mix for a ripe target.   Toyota is currently running their playbook on California at an unprecedented level.

88.   Toyota sold California government officials on a plan to help the state meet its long term zero emissions goal.  Toyota trumpets the idea that the Mirai is so clean that its only exhaust is water, and you can drink the water exhaust from the car's tailpipe.

89.   Toyota gave key California state politicians a hydrogen car including the chairwoman for the California Air and Resources Board.

90.   Toyota enjoys support and taxpayer money via its aggressive lobbying, and tax rebates and credits for consumers, cash for consumers from the state of California paid for by the taxpayers, and more recently $106 million dollars of tax payer funds for their hydrogen fuel network ambitions; paid for by passing on this cost to the Mirai owners in the form of exorbitant fees charged by the Department of Motor Vehicles for registration.

91.   Toyota sells thousands of Mirais to consumers with an array of incentives to their dealers for selling these cars, and Toyota enjoys unjust revenue and utilizes the data generated from consumers to their benefit.

92.   Toyota had their boot on the necks of each hydrogen station operator.

93.   Toyota's monopolistic conduct violates the antitrust laws and harms consumers.

94.   Toyota is the dominant player in the Hydrogen Fueling Market, (remember Honda sold less than 100 hydrogen cars ever in California and Hyundai sold less than 700, compared to Toyota's 20,000 sold) and has engaged in predatory and exclusionary conduct in furtherance of their monopolization,

- 15 -
**CLASS ACTION COMPLAINT**

causing Plaintiffs to suffer substantial economic injury as a result of Toyota's competition reducing violations of law.

95. True Zero matches and mirror Toyota's words and phrases to describe the fueling hydrogen process. Both Toyota and True Zero tell customers that it takes five minutes to refuel which is a lie because you have to wait at least that amount of time in between each use of the pump.

96. When customers complain or sue Toyota, points their fingers at the hydrogen stations or other actors for failures. Often when customers call True Zero when a pump is broken the representative will tell them to speak with Toyota.

97. Toyota has driven up the price of hydrogen to triple the costs because of their bullying the competition and stranglehold on the market.

98. Toyota's dealers and Toyota Motor Credit Corporation, enjoy the backwash of exasperated Mirai owners that desperately must trade their car in because it's useless and are forced to roll in their negative equity into new lucrative contracts with the dealerships and Toyota Motor Credit Corporation for additional new purchases or leases.

99. This action seeks recovery for Plaintiff's losses, as taxpayers and Mirai owner, extract Toyota's unlawful gains, and other appropriate equitable relief to prevent Toyota from continuing to leverage its market position, as the largest car manufacturer in the world and by far the largest hydrogen fuel car manufacturer in the world, to harm California consumers.

100. But for Toyota's anticompetitive practices, Plaintiffs would have had more options in the fueling stations for their Mirai and other manufacturers would have likely created more hydrogen and hydrogen vehicles for consumers. Those companies would have created fueling station options and vehicles that competed with Toyota on the merits of *clean hydrogen*, without being dependent on Toyota for sustainability. Because Toyota anticompetitively restrained competition in its efforts to obtain a monopoly on the hydrogen retail marker, competition was

- 16 -
**CLASS ACTION COMPLAINT**

foreclosed. Ultimately, consumers suffered, and continue to suffer, because of Toyota's wantonly anticompetitive harmful conduct.

101.   Toyota and First Element have systematically exploited their dominant market position in the hydrogen retail market to engage in a deceptive and manipulative pricing scheme, artificially inflating the true cost of hydrogen cars and hydrogen fuel and reaping profit. Their predatory practices not only drive up the price of hydrogen fuel but also prevents consumers from obtaining fuel.

102.   The artificial suppression of other hydrogen stations and pricing manipulation of the vehicles themselves is evidenced by the Mirai's lack of resale value, which consistently is less than 90% of the original purchase price.

103.   This stark disparity between the initial cost and the residual value reveals that the advertised price is not the true value of the vehicle.

104.   Toyota also fails to tell consumers that none of the parts needed on the hydrogen supply chain side, or their own car parts are in the United States, so if a pump or car needs heavy maintenance it could take months to even get the part made and shipped, let alone installed and fixed.

105.   Toyota fails to tell customers that they must service their Mirai at one of four dealerships qualified to service Mirais or else they void their warranty. Similarly, Toyota fails to tell people that there are only four dealerships in the country that can service the Mirai.

106.   Toyota fails to tell customers that it has loaned millions to First Element/True Zero.  Also, Japanese bank MUFG Bank which has an over 8.5 billion dollar stake in Toyota loaned First Element over $50 million.  Japan's state-owned bank JBIC has also made $23mn investment in First Element though their relationship with Toyota is not public.

107.   Toyota fails to tell customers that it had senior key employees in the First Element headquarters at all times dictating First Element's decisions and operations.

**CLASS ACTION COMPLAINT**

108.   Toyota salespersons would talk about True Zero and market the app of True Zero to customers as though they are a separate fuel company like Mobil when the reality is far from that; it was an unreliable Toyota puppet all along.

## CLASS ALLEGATIONS

109.   Plaintiffs bring this action on behalf of themselves and as representatives of all others who are similarly situated. Pursuant to Rules 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following class and subclass that are initially defined as follows:

**California Class: This class encompasses all California taxpayers from 2011 or as soon as Toyota began to receive benefits from the State of California for hydrogen while not producing clean hydrogen and blocking clean hydrogen production paid for by taxpayers from entering the market.**

**Mirai Subclass: All consumers that own or ever owned a Toyota Mirai and paid DMV registration for their Mirai.**

110.   Excluded from both the class and subclass are: (a) any officers, directors, employees, executives, board members, and legal counsel of Toyota, First Element or either of its affiliates; (b) any judge assigned to hear the case (or spouse or family member of any assigned judge); (c) any employee of the Court; (d) any juror selected to hear this case; and (e) any attorney of record in this case and Plaintiffs reserve the right to amend or modify the above class definition with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

**CLASS ACTION COMPLAINT**

111. **Numerosity**: The Class is so numerous that joinder of all members is impracticable. The number and identity of the Classes' members are presently unknown to Plaintiffs. There are millions of people in the class and many thousands of people in the subclass.

112. **Common Questions Predominate**: There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. These common questions of law and fact exist as to all members of the class and predominate over the questions affecting only individual members of the class. The common questions which predominate over individual issues include, but are not limited to; (a) whether Toyota lied to the state of California for funding and control (b) whether Toyota did not approve clean hydrogen stations from entering the market; (d) whether Toyota and First Element knew their marketing was reliant on lies and to what extent; (e) whether the Mirai failed in other countries prior to any sales of the Mirai in California (f) whether Toyota and First Element have monopolies in their markets and whether they tied their products (g) whether Toyota and First Element's conduct was violative of California consumer statutes (h) whether the class is entitled to restitution, treble and punitive damages.

113. **Typicality**: Plaintiff's claims are typical of the claims of the proposed Class, and Plaintiff will fairly and adequately represent and protect the interests of the proposed Class. Toyota and First Element engaged in a common conduct giving rise to the violations of the legal rights sought to be enforced uniformly by Plaintiffs and the Class members. Identical statutory violations, business practices and injuries are involved. Plaintiffs' claims are consequently representative of and co-extensive with the claims of Class members.

114. **Adequacy**: The named Plaintiffs are adequate representatives of the Class on whose behalf this action is prosecuted. Plaintiffs' interests do not conflict with the interests of the Class. Plaintiff has retained competent counsel with experience in class action litigation and will protect the interests of the Class in that

- 19 -
**CLASS ACTION COMPLAINT**

there are no conflicts between his interests and the interests of the other class members. The named Plaintiff and his counsel have the necessary resources to litigate this action, and counsel has the experience and ability required to prosecute this case as a class action.

115. **Superiority:** A class action is superior to any other available method for the fair and efficient group-wide adjudication of this controversy since individual joinder of all Class members is impracticable and these claims are not arbitrable. A class action presents fewer management difficulties and provides the benefits of a single adjudication and comprehensive supervision by a single court.

116. **Injunctive and Declaratory Relief:** Toyota and First Element's wrongful actions as alleged herein are uniform as to all members of the Class. Toyota and First Element has acted or refused to act on grounds that apply generally to the Class, so that final injunctive or declaratory relief is appropriate with respect to the Class as a whole.

117. **Toyota must be ordered to stop selling the Mirai and to pay back all tax funded benefits for their hydrogen scheme**.

### JURISDICTION AND VENUE

118. This action arises under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15. The action seeks to recover treble damages and disgorgement of profits, interest, costs of suit, equitable relief, and reasonable attorneys' fees for damages to Plaintiffs and members of the Class resulting from Defendants' restraints of trade and monopolization of the hydrogen retail market described herein.

119. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1332 (class action diversity jurisdiction), and 1337(a) (antitrust); and under 15 U.S.C. § 15 (antitrust). The Court also has subject matter jurisdiction over the state-law unjust enrichment claims presented in this action under 28 U.S.C. 1367 (supplemental jurisdiction).

- 20 -
**CLASS ACTION COMPLAINT**

120.   This Court has personal jurisdiction over Toyota because it is subject to general jurisdiction in the State of California, where it maintains numerous holdings, offices and salespoints.  The scheme to monopolize alleged in this Complaint caused injury to persons throughout California, including in this District. Moreover, Toyota also conducted substantial business from which the claims in this case arise in California and has agreed to personal jurisdiction in this Court.

121.   Venue is appropriate in this District under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision). Toyota transacts business within this District, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this District.

## FIRST COUNT

### Violation of the Sherman Act 15 U.S.C. § 2 (Tying)

122.   Plaintiffs incorporate all allegations in this complaint as though restated in this claim.

123.   Plaintiffs bring this claim individually and on behalf of the members of the Mirai Subclass against Defendants under federal law.

124.   The Sherman Act prohibits "monopoliz[ation] of] any part of the trade or commerce.  15 U.S.C. §2.

125.   As detailed above, Toyota has unlawfully tied their Mirai to the First Element fuel through their fuel card. A market exists for both the tying (hydrogen retail car) and tied (hydrogen fuel) products respectively.

126.   Toyota has sufficient economic power in the tying market, the hydrogen retail car market, to affect competition in the tied market, hydrogen fuel. Defendants willfully and intentionally engage in predatory, exclusionary, and anticompetitive conduct with the design, purpose, and effect of unlawfully maintaining their market and monopoly power.

- 21 -
**CLASS ACTION COMPLAINT**

127.    The availability of the Mirais is conditioned on consumers purchasing fuel from Defendants. In other words, consumers are coerced into purchasing fuel from Defendants by virtue of wanting to purchase the Mirai. This is anticompetitive tying conduct.  This is exacerbated by the fact that consumers have no clue this is happening in the background *and* that their car will be reduced in value by 90% the moment after they buy the car; additionally fuel prices are raised.

128.    Defendants have sufficient economic power in their markets to coerce consumers into purchasing specific hydrogen fuel and their conduct affects a substantial amount of commerce.

129.    Defendants used their market power to manufacture harmful hydrogen to the environment contrary to the state and taxpayers goals and desires.

130.    Defendants abused their market power to target and profit off of poor people, while systematically building the fueling stations on in rich neighborhoods. Toyota had open meetings about this with True Zero and other minor hydrogen market players.

131.    Plaintiffs and the other members of the Classes were harmed and Defendants' violation of the Sherman Act was a substantial factor in causing this harm.

## SECOND COUNT

**Violation of the Cartwright Act Cal. Bus. & Prof. Code, § §16720 16727**

132.    Plaintiffs incorporate all allegations in this complaint as though restated in this claim.

133.    Plaintiffs bring this claim individually and on behalf of the members of the California Class and Mirai Subclass against Defendants under California law.

134.    Defendants' acts and practices detailed herein violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., which prohibits, inter alia, the

**CLASS ACTION COMPLAINT**

combination of resources by two or more persons to restrain trade or commerce, or to prevent market competition. (Cal. Bus. & Prof. Code, §§ 16720, 16726.).

135. Defendants' acts and practices detailed herein violate the Cartwright Act, Cal. Bus. & Prof. Code § 16727, which makes it "unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the purchaser thereof shall not use or deal in the goods, merchandise, or services of a competitor, where the effect of such contract for sale, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." (Cal. Bus. & Prof. Code, § 16727.).

136. Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

137. The Cartwright Act also makes it "unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." (Cal. Bus. & Prof. Code, § 16727.)

138. As detailed above, Toyota unlawfully tied their Mirais to their debtor First Element or other approved fueling stations.

- 23 -
**CLASS ACTION COMPLAINT**

139. Defendants have sufficient economic power in the tying market to affect competition in the tied market.

140. The availability of the Mirai is conditioned on customers purchasing fuel from Defendants. In other words, consumers are coerced into purchasing fuel from Defendants by virtue of wanting to purchase the Mirai.

141. The tying product, the Mirai, is separate and distinct from the tied products, the fuel required to be purchased by consumers because consumers such as Plaintiffs have alternative options for the fuel and would prefer to choose among them independently from their decision to purchase Mirais. Defendants' unlawful tying arrangements thus tie two separate products that are in separate markets.

142. Defendants have sufficient economic power in the market for to coerce consumers into purchasing fuel from Defendants and to control prices for hydrogen fueled cars. To illicitly direct the flow of state government funds and power.

143. Plaintiffs and the other members of the Class and Subclass were harmed and Defendants' violation of the Carwright Act was a substantial factor in causing this harm.

## THIRD COUNT

### Monopolization of Retail Hydrogen in Violation of the Sherman Act § 2

144. Plaintiffs incorporate all allegations in this complaint as though restated in this claim.

145. Toyota has willfully acquired and maintained monopoly power in the relevant Hydrogen Retail Markets. Toyota, is the largest car manufacturer and by all measures the largest hydrogen fuel car manufacturer has the power to control prices and exclude competition in both the Hydrogen Retail Vehicle Market and Hydrogen Retail Fuel Market.

146. Toyota has willfully acquired and maintained monopoly power in the Hydrogen Retail Vehicle Market and the Hydrogen Retail Fuel Market by means of predatory, exclusionary, and anticompetitive conduct. Such conduct includes,

**CLASS ACTION COMPLAINT**

but is not limited to: (a) engaging in a scheme to exclude hydrogen stations from entering the market (b) weaponizing its market position to retroactively impose standards (c) market the vehicle as green when it's not (d) illicitly obtain taxpayer funds to further its goals (f) obtain data from consumers by means of deception.

147.   Toyota's destruction of competition caused antitrust injury to Plaintiffs and Class members by lobbying for taxpayer funds, misusing taxpayer funds, eliminating meaningful competition, pollution the environment in the name of helping the environment and continuing to maintain its dominance to sell and profit off California consumers.

148.   Toyota wasted taxpayer funds by preventing Cal State from selling hydrogen to consumers for seven years.

149.   There are no legitimate pro-competitive or business justifications for the conduct alleged herein, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

150.   Toyota's acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

151.   Toyota's conduct has had a substantial effect on interstate commerce..

152.   Plaintiffs and Class members have been, and will continue to be, injured in their property as a result of Toyota's conduct.

153.   Plaintiffs and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) higher costs for fuel; (b) depreciation of their vehicles; and (c) wasted taxpayer funds (d) more pollution.

154.   Plaintiffs and Class members seek an award of treble damages or, in the alternative, disgorgement of Toyota's ill-gotten gains. Plaintiffs also seek appropriate equitable relief to enjoin Toyota from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms

- 25 -
**CLASS ACTION COMPLAINT**

that Toyota's monopolization of the Hydrogen Fuel and Vehicle Markets has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Toyota to stop selling their hydrogen vehicles to consumers (c) for Toyota to return all taxpayer funds and benefits they received or caused to be generated.

## FOURTH COUNT

### Fraud

155.   Plaintiffs incorporate all allegations in this complaint as though restated in this claim.

156.   Plaintiffs bring this claim individually and on behalf of the members of the Mirai Subclass against Defendants under federal law.

157.   Plaintiffs are consumers.

158.   Toyota and First Element are alter egos of each other and agents of each other.

159.   Toyota sales agents and their websites and True Zero's website sell consumers on the fact that "fueling is easy and takes a few minutes".  It takes much longer than this even when the hydrogen pumps are working.  Toyota uses the True Zero app to market the car to consumers and the app gives them the false impression more pumps are operational and dispensing fuel than actually are.

160.   The Mirai relies on First Elements fueling station network.

161.   The fueling stations are so frequently down that they are unfit for use.

162.   Toyota knows this and fails to tell consumers.

163.   In fact, Toyota explicitly lies to consumers with their sales agents promising additional hydrogen stations and a thriving fueling network.

164.   The sales agents often use brochures with written material about mileage that isn't close to reality.

165.   The sales agents use the website to create the illusion that more fuel pumps exists when in fact the website they control is never accurate.

**CLASS ACTION COMPLAINT**

## FIFTH COUNT

### Violation of California Consumer Privacy Act

166. Plaintiffs incorporate all allegations in this complaint as though restated in this claim.

167. California residents have the right to bring a lawsuit under the CCPA when "nonencrypted and nonredacted personal information . . . [is] subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information." Cal. Civ. Code § 1798.150(a)(1).

168. Toyota sells an unprecedented amount of consumer data to third parties without consumer knowledge and without consent or a proper opt out opportunity.

169. Under the CCPA, Toyota failed to inform consumers before the point of collection about the categories of personal information to be collected and the purposes for which the information will be used.

## FIFTH COUNT

### Invasion of Privacy

170. Plaintiffs incorporate all allegations in this claim.

171. Toyota violated legally protected privacy interests: 1) informational privacy, which involves the dissemination of confidential sensitive information, and 2) autonomy privacy, as Toyota Mirai consumers were not free to make intimate personal decisions or conduct personal activities without observation, and intrusion.

172. Plaintiffs have a reasonable expectation of privacy when they purchase a car to not be watched and have their driving habits and personal information collected and sold.

**CLASS ACTION COMPLAINT**

173.   The third element requires that the invasion of privacy be serious in both its nature and scope. This element is intended to screen out trivial or de minimis intrusions. The invasion must be sufficiently serious to constitute an egregious breach of the social norms underlying the privacy right.

174.   The CCPA mandates that if a business sells personal information, it must include a "Do Not Sell My Personal Information" option that allows consumers to opt-out of the sale of their personal information.  Toyota fails to provide this CCPA mandated option to Mirai consumers.

## DEMAND FOR JURY TRIAL

175.   Plaintiffs hereby demand trial by jury in this class action.

## PRAYER FOR RELIEF

176.   Wherefore, Plaintiffs pray for judgment as follows:

177.   For an order certifying this action as a class action under Fed. R. Civ. 23, defining the Classes as requested herein, finding that Plaintiffs are proper representatives of the Classes requested herein, and appointing Plaintiffs' counsel as Class Counsel.

178.   Injunctive relief to stop Toyota and First Element from hydrogen operations in California;

179.   For diminution in value as to vehicles and taxpayer funds;

180.   For incidental and consequential damages according to proof at trial;

181.   For treble damages;

182.   For punitive damages;

183.   For reasonable attorney's fees and costs of suit;

184.   For a claw back and return of all taxpayer/state funds provided to Toyota through DMV registration rate increases or otherwise;

185.   Injunctive relief to bar Toyota from any future eligibility for any taxpayer/state funds.

186.   For other further relief as the Court may deem just and proper.

**CLASS ACTION COMPLAINT**

Dated:  September 27, 2024                    THE INGBER LAW GROUP

                                             */s/ Jason M. Ingber*
                                             Jason M. Ingber, Esq.
                                             Attorneys for Plaintiffs

**CLASS ACTION COMPLAINT**

# EXHIBIT A

## DECLARATION OF MICHAEL G. DRAY, ESQ.

1.     My name is Michael Gerard Dray, and I submit the following to be true under penalty of perjury per the laws of California based on my personal knowledge and observations as a public employee.

2.     I have roots in new energy technology.  For 12 years I operated an experimental waste to energy conversion plant for the City of Columbus Refuse and Coal Fired Municipal Electric plant.  I served as a 1st class steam operating engineer in Ohio, which permits me to operate any powerplant in Ohio that produces non-nuclear energy.

3.     I have a Bachelor's Degree from Capital University in Columbus, Ohio with a major in political science and minor in chemistry which I earned in 1992; and I earned my Juris Doctor from Capital University Law School in 1999 and I became a member of the Ohio state bar in 1999.

4.     I practiced law as a solo general practitioner in Ohio for six years.  My work included a variety of family, criminal, labor and employment and contract formation.

5.     My wife is a biochemist and she was offered a job as a professor and in Cal Poly San Luis Obispo, which she accepted.

6.     We moved to California in 2007.  While studying for the California bar exam in San Luis Opsbo I held a job with Aerotech Engineering which fabricated drones.  I passed the California bar and earned admission to practice throughout state and federal courts in California.

7.     My wife soon thereafter received a job offer from Cal State Los Angeles in a management and hiring at the University, and she accepted, so we moved to Pasadena/Los Angeles where we have lived since.

8.     For the next two years, I worked for the oil company Conoco Phillips in their Long Beach office for real estate, property tax, right of way, and claims department.

- 1 -

**DECLARATION OF MICHAEL G. DRAY, ESQ.**

9. Around this time, I became aware through my wife that the University was having trouble getting their hydrogen station to be operational and that they were looking to hire someone to be the project manager for their hydrogen station.

10. The University is publicly funded.

11. The University received a two and a half million-dollar grant from the California Air and Resources Board to build a hydrogen station. The University spent its own funds and said grant to bring the station to fruition for a total of over $5 million.

12. Additional philanthropic funds and other university funds were used to purchase the land and to fund this initiative. The University couldn't get the hydrogen station to work properly, because the pumps experienced unscheduled pulsations and vibrations. These pressure issues prevented the OEMs or auto-manufacturers from authorizing the University pumps. General Motors brought a prototype car for the University to test the pumps on and documented the inconsistent pressure.

13. I applied for the job to fix the hydrogen station in late 2012 and was hired in March 2013 as the founding hydrogen station manager of operations and marketing.

14. My official job title was: Technical Operations Manager College of Engineering Computer Science and Technology and Hydrogen Research and Fueling Station. I had a staff of about five technicians and employed 8-10 student engineers.

15. My first order of business was to attend a national conference in Washington, D.C. for a Department of Energy Conference. I shared the issues at the University station with preeminent hydrogen industry leaders and I met with approximately six engineers at that conference, and they told me about their opinion on how to correct the hydrogen station. It was a unanimous consensus among the various experts that we needed to install a high-pressure buffer tank to fix the uneven pulsations occurring at each fueling event.

16. After the Department of Energy conference, I returned to campus and put plans into place to procure said high-pressure buffer tanks and hire contract workers.

- 2 -

**DECLARATION OF MICHAEL G. DRAY, ESQ.**

17. The general contractor who built the station was refusing to fix it even though his original drawings included a buffer tank; at this point the station was two to three years behind schedule.

18. The tanks were eventually purchased and flown from Vienna, Austria. At an expensive $20,000 shipping cost and over $100,000 to install.

19. It took me one year to turn the University's land and existing infrastructure into an operational hydrogen station.

20. The installation of the buffer tanks was successful; it completely eliminated the pulsation issues that the OEMs had expressed concerns about.

21. General Motors returned to the University and confirmed that the pulsation issue was fixed.

22. Next, General Motors raised another issue, which was a fire safety issue: under the fire codes, specifically the NFPA (National Fire Protection Act) hydrogen technology fueling fire code number 52, during a fueling with hydrogen, the process must be paused periodically to monitor pressure loss in the lines going into the cars because any such pressure loss indicates there's a leak in the lines, and this is a testing requirement from the from the State Fire Marshall.

23. It took us a year to fix this problem. Throughout this time General Motors would send vehicle prototypes for us to test our station.

24. I recognized that this needed to be addressed and would require reprogramming of the hydrogen dispenser, so I sought out and received a waiver from the California State Fire Marshall, whereby the Fire Marshall visited the station and we discussed the issues and they agreed that the University would be allowed to fuel cars notwithstanding this deficiency if the station attendants performed the fueling for customers and we monitored for hydrogen leaks with a handheld hydrogen detector. This allowed me to negotiate out ability to be safe and protect against leaks.

- 3 -

**DECLARATION OF MICHAEL G. DRAY, ESQ.**

25.    Once the State Fire Marshall approved our temporary fix to handheld test for Hydrogen leaks, Honda and Hyundai agreed to send some cars over to test the station.

26.    Soon thereafter, Hyundai allowed their customers to fuel at the University station and the University sent invoices to the OEMs which reimbursed the University.

27.    Throughout 2014, I personally sent these invoices monthly which included VIN of each vehicle and Hyundai had repaid the University significant sums.

28.    We were not yet certified by the California Department of Weights and Measures for accuracy (we obtained this certification in 2015) as to fuel pumped versus fuel charged, but Hyundai was paying for the fuel so it was of no consequence to the consumers. We achieved the first certification from the Department of Weights and Measures in 2014.

29.    In the midst of these obstacles and achievements there was a meeting of the California Fuel Cell Partnership[1] at the Torrance Shell hydrogen station.

30.    A topic of discussion was Toyota had raised a prerequisite from their perspective of requiring fuel pumps to accept credit cards.

31.    At the meeting in Torrance, I raised the issue that as a station operator, it seems obvious that the method of payment should be controlled by the station operators not the auto makers. I specifically stated that "…as a matter of fact, I believe if I want to accept a crate of chickens for hydrogen that is up to the operator…" but despite my protestations the California Fuel Cell Partnership and the members therein decided to impose, and Hyundai and Honda acquiesced by silence, to this new requirement for a credit card reader to be on site.

32.    Toyota had the majority of the hydrogen cars on the road, and I believe the CA Fuel Cell Partnership charged membership dues based on how large the company was, so Toyota had a de facto veto at these meetings.

---

[1] The CA Fuel Cell Partnership was at first a cooperative organization that had the stated goal to uniformize the hydrogen retail standards but it quickly became closely tied to Toyota's needs.

- 4 -

**DECLARATION OF MICHAEL G. DRAY, ESQ.**

33.    I installed a credit card reader in the University station control room.

34.    Toyota refused to send any cars or staff to visit the hydrogen station.

35.    After the University achieved the certification from the Department of Weights and Measure Toyota continued to refuse to visit the University station or provide any cars to the University to test the station.

36.    At the next meeting after the University achieved the certification from the department of weights and measures  at one of the CA Hydrogen Partnership meetings, Spencer Quan who worked for and represented Toyota at these meetings said to me, "you have a lot of guts to declare yourself open to public" to which I responded something of the effect of "but I am, I have Fire Marshall approval, state certifications and building occupancy permits to sell hydrogen."

37.    Toyota then advocated for the University to be taken off the h2fcp.org website (the site that advised drivers which stations were available). I received phone calls from state officials that convinced me not to fight over this removal as it would be temporary.

38.    Next Toyota insisted that our University station, and all stations, meet a new fueling protocol.  A new fueling protocol that had never been pronounced as a perquisite and one that the University station was never built to meet.  The protocol was called the SAE (Society of Automotive Engineers) J2601, which stipulated for a control scheme which the station was not built to achieve, and Toyota knew this.

39.    So I endeavored to meet this new retroactive harsh standard over the course of the next two to three years.  My endeavors involved hiring a former JPL engineer and marshalling several contract vendors and coordinating an epic attempt to satisfy Toyota.  My endeavors also included the expenditure of several hundred thousand dollars of tax payer money. I was forced to spend money given to me by the California energy commission under a maintenance grant; forced to spend that money to make material modifications to the station and not deal with maintenance, and those funds had been earmarked for maintenance.

- 5 -

**DECLARATION OF MICHAEL G. DRAY, ESQ.**

40.     All this time Toyota refused to send the University a car to test our progress or station.

41.     Toyota also explicitly refused to lease a car to me, and again they refused to ever provide a car to assist with tuning the station to their specifications.

42.     We created/commissioned with taxpayer money to test their testing standards on our station.  This was a device called the Hystep: a million-dollar test device that the state had constructed to test fueling stations to meet SAEJ2601.

43.     I along with my team helped the state get a testing device running so that we can be tested.  Again, there was not even a testing device available in the world to meet the rigorous testing demands of Toyota.

44.     Thereafter we modified the station further and we passed the testing to the best of our abilities.  The University station was not built to cool hydrogen to minus 40 degrees and Toyota said it was ok to be minus 20 degrees instead of minus 40 degrees which just meant that they would perform the fueling slower.

45.     For the better part of a decade, Toyota continued to impose outrageous and never-ending new regulations.  For example, suddenly Toyota request that the station needs to be open 24/7.  Toyota began to protest the University station saying it wasn't big enough.  I advocated for the need for an attendant at the University station because of my awareness of the importance to have boots on the ground due to constant glitches but this was contrary to the model Toyota was pushing.

46.     Again, Toyota had total control in prohibiting the customer from using the University station because they did not allow the fuel card to work at the University station or provide reimbursements.

47.     I gave my cell phone number to the drivers, and people would call me every day early in the morning or on weekends, and I'd make fueling reservations for people and accommodate desperate drivers so when they came I had their names written down and fuel saved for them.  Over the years I fueled thousands of cars and would help out Toyota drivers in the ways I could.  At some point I was fueling

- 6 -
**DECLARATION OF MICHAEL G. DRAY, ESQ.**

experimental buses and selling hydrogen by filling trailers by what we're producing after Toyota had excluded customers for so many years; Toyota raised it in meetings that they wanted the fuel station to only service cars light weight cars which I refused to do based on free market principles: we can sell hydrogen to whoever we want as long as they're paying as long as there's fuel and its safe.

48. Even the dealerships couldn't fuel the cars. There were many times that Longo Toyota would beg the University station for fuel because the cars they were selling had run out of fuel and they couldn't refuel them.

49. Around 2017 I informed the governor's office about the unrelenting control Toyota was exerting on us.

50. It was my impression, that newly built stations by First Element were rapidly approved. In my opinion Toyota went out of their way to help First Element. To my knowledge, Toyota had at least one "consultant" working full time in First Element to observe and report on First Element's operations to some degree. Thus, I suspected that a creditor for First Element was at the very least observing them, if not actually policing their movements.

51. The hydrogen stations throughout California in general have suffered greatly because of immature supply chains and fly by night vendors: manufacturers who are not invested or don't have a reputation to protect. I had numerous times where I needed critical parts for the station and suppliers would flat out refuse to respond.

52. In my opinion, Toyota's control on the hydrogen market had a chilling effect on other potential actors from entering the hydrogen market.

53. In my opinion, Toyota sold too many hydrogen cars and overwhelmed the infrastructure and hydrogen supply.

Dated: August 21, 2024                    MICHAEL G. DRAY, ESQ.


- 7 -
**DECLARATION OF MICHAEL G. DRAY, ESQ.**

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Los Angeles_

On _08/21/2024_ before me, _Lindsey Schwartz Notary Public_
            Date                    Here Insert Name and Title of the Officer

personally appeared _Michael G. Dray, Esq._

_____
                    Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

LINDSEY SCHWARTZ
COMM # 2360904
Los Angeles County
California Notary Public
Comm Exp June 12, 2025

Signature _____
            Signature of Notary Public

Place Notary Seal Above

———————————————— OPTIONAL ————————————————
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _Declaration_          Document Date: _____
Number of Pages: _____   Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____          Signer's Name: _____
☐ Corporate Officer — Title(s): _____      ☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited  ☐ General                 ☐ Partner — ☐ Limited  ☐ General
☐ Individual      ☐ Attorney in Fact              ☐ Individual      ☐ Attorney in Fact
☐ Trustee      ☐ Guardian or Conservator          ☐ Trustee      ☐ Guardian or Conservator
☐ Other: _____             ☐ Other: _____
Signer Is Representing: _____           Signer Is Representing: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907