# EXHIBIT 1

The Ingber Law Group
Jason M. Ingber (SBN 318323)
3580 Wilshire Blvd., Suite 1260
Los Angeles, California 90010
T:310-270-0089
E-mail: ji@jasoningber.com

Attorney for Claimant

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| Alex Williams, | AAA Case No.: 01-24-0006-5479 |
| Claimant, | |
| vs. | **COMPLAINT FOR DAMAGES** |
| Toyota Motor Sales, U.S.A., Toyota of Santa Monica, First Element, Inc. a California corporation, Toyota Motor Credit Corporation. | Presiding Arbitrator Arocles Aguilar |
| Respondents. | Original Federal Class Action Complaint Filed on October 30, 2023 |

Toyota has lost its way. What was once a family run business in the early 1900's has turned into a colossal capitalistic monster interested in profit over its customers. Thousands of lawsuits/arbitrations have been filed related to the Toyota Mirai hydrogen car and Toyota does not care; they keep selling the car to this day.

Before we delve into the plight of claimant, let's illuminate how Toyota is responsible for California's hydrogen fueling network, and then the lies that Plaintiff suffered at the point of sale for his hydrogen fuel car that ruined his life.

## MARKET POWER ABUSE

1.      Toyota wasted and wastes California taxpayer money.  Toyota, a foreign company, colonized California's hydrogen fuel market.

2.      In the United States, hydrogen fueled light duty vehicles are only sold in California.

3.      Toyota has sold over 20,000 hydrogen powered cars compared to approximately 700 hydrogen fuel powered cars collectively sold by Hyundai and Honda.

4.      Toyota is the undeniable leading stakeholder in the California hydrogen fuel market with over 95% of the market share.

5.      Toyota shaped California's unreliable *dirty hydrogen* fuel infrastructure from ground zero.

## TOYOTA ATTACKS A PUBLIC UNIVERSITY

6.      About fifteen years ago, California State University, Los Angeles (the "Cal State LA") applied for a California state government grant, so that Cal State LA could build a *clean hydrogen* fuel station.[1]

7.      A grant was awarded around 2010, and construction began!

8.      Cal State LA faced issues quickly as to irregular pulsation in the pumps in its early construction phases, and so, Cal State LA hired Michael Dray as the station and project manager.[2]

9.      It took Michael Dray over a year to fix the pump's pulsation issue.

10.      Cal State LA was subsequently approved by the California Division of Measurement Standards (DMS); the Cal State LA's pumps earned a seal of approval from the DMS.

---

[1] Toyota extracts hydrogen from methane, which generates emissions worse than conventional gasoline vehicles.  **For every kilogram of hydrogen they extract, 12 kilograms of carbon dioxide—*the very gas choking our atmosphere and accelerating the planet's demise*—are belched into the sky.**  Cal State LA extracted hydrogen from water using renewable energy, *a method where zero harmful gases are released to the environment.*

[2] Please see attached **Exhibit A**, a signed sworn statement of Michael Dray, Esq.

**COMPLAINT FOR DAMAGES**

11.    Cal State LA's hydrogen fuel station earned this seal of approval by passing rigorous tests for accuracy as to amounts dispensed and amount charged to customers; fire system protections, etc.  In sum, Cal State LA had a literal seal of approval from the state of California to sell hydrogen to the public.

12.    Cal State LA continued to test the pumps and in 2011, Cal State LA internally agreed that their fuel pumps were safe, and ready for public use.

13.    Many vehicles began to fuel at Cal State LA's *clean hydrogen* pumps.

14.    After the DMS awarded approval, the Cal State LA's pumps were added to the website, h2fcp.org/stationmap; the website holds itself out to provide real time maps for open hydrogen stations, so drivers know where they can refuel. The website h2fcp.org/stationmap is the main source for hydrogen fuel car drivers to know where they can fuel their cars.

15.    This h2fcp.org/stationmap website is officially run by a weird creature called the Hydrogen Fuel Cell Partnership.

16.    The Hydrogen Fuel Cell Partnership is a weird creature because it's a quasi-governmental entity that is truly run by Toyota.

17.    Shortly after Cal State LA was added to h2fcp.org/stationmap informing drivers they could fuel at Cal State LA, Toyota forced the Hydrogen Fuel Cell Partnership to remove Cal State LA's fuel station off h2fcp.org/stationmap.

18.    Michael Dray represented Cal State LA on a conference call with the Hydrogen Fuel Cell Partnership about Cal State LA's removal from the website.

19.    On this conference call a man named Spencer Quan, an engineering consultant that worked for Toyota said, "it takes a lot of guts to say your [hydrogen station is] open to the public." To which Michael Dray responded, "but we are." And Spencer Quan replied, "no you're not, because Toyota vetoes that."

**COMPLAINT FOR DAMAGES**

20.     Before and after that conference call, Spencer Quan ratcheted pressure on the Hydrogen Fuel Cell Partnership, and California Air Resources Board, to remove Cal State LA's fuel station from h2fcp.org/stationmap.

21.     Michael Dray received intense pressure from personnel with the California Air Resources Board to force him to agree to be removed from h2fcp.org/stationmap.

22.     Michael Dray resisted this removal off the website, because as a taxpayer, citizen, and public employee, he knew that it was in the public's interest that Cal State's $6 million *clean hydrogen* station paid for by California taxpayer and philanthropic money be available for public use and known to the public.

23.     It became explicit that if Toyota would not approve Cal State LA's *clean hydrogen* station, then Cal State LA would have no customer base anyway, so Michael Dray acquiesced to be removed from the website, with an agreement that Toyota would visit Cal State LA's *clean hydrogen* station and eventually approve it and put it back on the website.

24.     Over the next five years Honda and Hyundai allowed the use of Cal State LA's *clean hydrogen* station for its drivers, but Toyota refused to approve the station for its drivers or ever visit.

25.     Toyota could control and did control its customers through blocking the fuel card that they provide drivers for hydrogen fuel from working at Cal State LA. Thus, Toyota was able to control and block their customers from using stations they didn't approve of with the "free" hydrogen fuel cards they give their customers.  These are debit cards that are provided to customers that purchase the Mirai and are financial instruments that Toyota controls.

26.     Another way Toyota controls their customer drivers is Toyota threatens to void the warranty if they fuel up anywhere besides their approved stations.

27.     Toyota attacked Cal State LA's *clean hydrogen* station in more ways.

- 4 -
**COMPLAINT FOR DAMAGES**

28.     Toyota retroactively imposed a new fueling standard called SAEJ2601.

29.     This new fueling standard SAEJ2601 was intentionally unrealistically high.  This was admitted to Michael Dray by an engineer named Jesse Schnieder.

30.     Mr. Schnieder was a member of the committee that pushed the retroactive prohibitive fueling standard.

31.     Then Mr. Schnieder did nothing about it for the same reason no one did anything to argue with Toyota: because people were afraid of Toyota.

32.     Toyota's grip became so nefarious that numerous individual hydrogen station owners had a meeting to discuss what to do about Toyota's ironclad control and retroactive new standard, and at that meeting Michael Dray suggested that the station owners form an association, and the CEO of First Element agreed with Michael Dray.

33.     Nothing ever came from that meeting.

34.     Shortly after, Toyota lent First Element over $25 million.

35.     Consequently, the largest hydrogen fuel station operator in California, with over 50% of the market share, is, and was beholden to Toyota financially, as a debtor.  For the purposes of this case, First Element is an alter ego of Toyota.

36.     From that point on, First Element (i.e. True Zero) stations were instantly approved, and added to h2fcp.org/stationmap overnight as they were built, but not Cal State LA's *clean hydrogen* and other private pumps.

37.     When Toyota first came out with this new retroactive SAEJ260 standard, Toyota said they won't use it as a hammer, and it would serve only to enhance performance. Instead, Toyota did the exact opposite…

38.     Toyota forced Cal State LA to spend millions of taxpayer dollars over the years, to meet a standard that was nonexistent when Cal State LA's *clean hydrogen* fueling station was built and approved by the state and other car manufacturers.

**COMPLAINT FOR DAMAGES**

39.     Cal State LA spent years and millions to meet Toyota's never-ending demands.

40.     Cal State LA changed the electronic programming of the fuel dispensers to improve the tanks' chiller per Toyota's request.

41.     Cal State LA hired an engineer that worked for NASA's Jet Propulsion Laboratory to help meet new requests from Toyota, which were all done exactly per Toyota's specifications.

42.     Throughout this time, Honda and Hyundai continued to allow their drivers to use Cal State LA's *clean hydrogen* fueling station, but Toyota did not.

43.     The harassment and threats by Toyota increased.

44.     Toyota, in meetings with their engineers, and Michael Dray and his consulting engineers, threatened to have the California government shut down the Cal State LA's *clean hydrogen* fueling station, if the university didn't jump through all of their hoops.

45.     Toyota complained about the Cal State LA's fuel station hours of operation.

46.     Cal State LA wanted there to be a limit, so that the university could afford to always have an attendant present to help people refuel, as refueling hydrogen is not intuitive, and, even on a good day, a station will glitch.

47.     Toyota refused that line of logic, and required Cal State LA to keep their fueling station open 24/7 with no attendant present.

48.     Toyota insisted that a credit card reader be installed in the pumps even though the station had a card reader (paid for by tax payer money) that worked just fine in their office and had capacity to accept Toyota's fueling cards, however Toyota continued to block Cal State LA from h2fcp.org/stationmap or allow the university to sell fuel to its customers.

**COMPLAINT FOR DAMAGES**

49.     Michael Dray installed a credit card reader into the fuel dispenser which took over a year and copious taxpayer money. Toyota continued to refuse to approve Cal State LA to rejoin h2fcp.org/stationmap.

50.     To meet SAEJ2601, Cal State LA's fuel station was forced to undergo rigorous testing.  However, a device to test this impractical standard did not exist, and so Cal State LA had to commission a device to test their fueling station as to the new retroactive standards.  Cal State LA created said testing device to test moisture levels as requested by Toyota.

51.     Toyota never, not once, visited to check on all these tests.  Instead, they lobbed endless new demands on Cal State LA.

52.     Toyota imposed these retroactive standards on other stations as well.

53.     So, contrary to Toyota's comments that the retroactive standard SAEJ2601 wasn't going to be used as a weapon, Toyota indeed weaponized the retroactive standard.

54.     Around this time, it became clear that no existing fueling station could meet the retroactive standard.  Yet, new True Zero stations were automatically approved.

55.     Toyota finally said they have no problem with the technical performance of Cal State LA fueling station.

56.     Now Toyota became concerned with the Cal State LA station's capacity because Toyota stated it was too small, as it could only fill 20 cars a day. So, Toyota began to demand to see the Cal State LA station's maintenance plans and parts that it kept in inventory.

57.     Michael Dray provided all these to Toyota, and still they refused to approve the Cal State LA station to be on h2fcp.org/stationmap or allow their drivers to fill up at the Cal State LA's station.

**COMPLAINT FOR DAMAGES**

58.    Throughout these years, Toyota Mirai drivers by the thousands would pull into the Cal State LA station and ask for fuel and Michael Dray had to turn them away.

59.    People would drive in with kids in their car saying they were desperate because two or three other hydrogen stations they went to didn't have any hydrogen fuel and Michael Dray had to send them back on the California highway with little or no fuel.

60.    After these years and years and years of moving goal posts, Michael Dray went to a meeting with the Fuel Cell Partnership at the headquarters of Honda in Torrance, where again Toyota publicly resisted providing their approval to Cal State LA even though Honda and Hyundai allowed their customers to use the university station for years and had repeatedly openly approved of the university fueling station.

61.    At that point, Michael Dray went to the state of California Governor's Office of Business and Economic Development (GO-Biz) and said to Tyson Eckerle, the department's Senior Advisor for Clean Infrastructure and Mobility, that taxpayers paid for the Cal State LA *clean hydrogen* fueling station and the taxpayers have gone through a fraud for the better part of a decade.

62.    Michael Dray threatened that if the university station was not approved immediately for h2fcp.org/stationmap and use for Toyota customers, then he would go to the energy committees legislator with these fraud details.  Shortly thereafter, Cal State LA's fueling station was approved by Toyota.

## TOYOTA POLLUTES CALIFORNIA WITH DIRTY HYDROGEN

63.    Why did Toyota target and thwart Cal State LA's fueling station for over seven years?

64.    One reason for the targeted harassment to the university was because the university was one of the only stations making *clean hydrogen* i.e. producing hydrogen from water.

**COMPLAINT FOR DAMAGES**

65.     Toyota decided from the git-go that this green process was not profitable.

66.     Toyota decided they were going to produce hydrogen fuel from methane.

67.     Toyota wanted to chill competition, innovation and environmental minded hydrogen makers.

68.     This is a major betrayal to California taxpayers.

69.     *Dirty hydrogen* production emits large amounts of $CO_2$, even if the hydrogen car itself claims to produces zero emissions.

70.     Toyota's hydrogen is not inefficient; it's a scam, a monumental deceit crafted to ensure their continued stranglehold on energy production.

71.     Toyota forces the hand of the market, creating fleets of hydrogen cars powered by *dirty hydrogen*—cars that emit zero pollutants at their tailpipe but leave a trail of destruction at every stage of fuel production and overall much worse than electric or gas/diesel cars.

72.     Toyota argued for years and to this day that the production of hydrogen fuel from fossil fuels was only a temporary step to bridge the gap to producing hydrogen from water.  But it's been decades of these promises and still hydrogen fueled cars pollute the environment more than gas powered cars.

73.     Toyota continues with their marketing saying these Mirais are zero emission vehicles! And it's the best deal on the planet! While behind the scenes they engage in carbon credit purchases and layers of nefarious control to hide how bad their hydrogen push is for the environment.

74.     True Zero, which is owned by First Element and controls the most hydrogen stations in California advertises on their website to this day (and likely tomorrow and the next day and the day after) boldly: "Filling up your hydrogen vehicle is as easy as filling up a vehicle with gasoline or diesel fuel – only cleaner!".

**COMPLAINT FOR DAMAGES**

75.     It is a complete lie and misrepresentation to juxtapose filling up a car with hydrogen to gas.

76.     For one, hydrogen fuel is more complicated than filling a car with liquid fuel by many multiples.

77.     Practically, the points of failure, extreme temperature storage conditions, temperature fluctuations during different times of the year, and innumerable other mechanical workings all contribute to a much longer than five minute fueling period for consumers.

78.     But this desire to market hydrogen fuel like gas is what drives Toyota and their actions. Toyota neglected to tell drivers of the complexities and difficulties associated with fueling from hydrogen stations and their ever-increasing retroactive regulations on hydrogen stations they were imposing.

79.     Toyota has a playbook for hydrogen that they have inflicted on other countries like Denmark, Scandinavia, and Germany, where you will find hundreds of abandoned Toyota Mirais and inoperable hydrogen stations collecting mothballs:

    1) Toyota sells a government with a fraudulent bill of good that premised on a promise to make a greener future;

    2) Toyota provides hydrogen fueled cars to key local politicians for free and lobby aggressively for taxpayer money;

    3) Toyota enjoys revenue and customer data and hydrogen data it sucks up from their cars, customers and stations;

    4) Toyota abandons the hydrogen infrastructure and points fingers at everyone but themselves and leaves.

80.     Toyota is currently doing this to California, and California is a ripe target.

**COMPLAINT FOR DAMAGES**

81.     Toyota sold California on a plan to help the state meet its long term zero emissions goal with a car that was so clean you could drink the water exhaust from its tailpipe.

82.     Toyota gave key California state politicians a hydrogen car including the acting chairwoman for the California Air and Resources Board.

83.     Toyota enjoys support and taxpayer money via its aggressive lobbying, and tax rebates and credits for consumers, cash for consumers from the state of California paid for by the taxpayers, and more recently $106 million dollars of tax payer funds for their hydrogen fuel network ambitions; paid for by passing on this cost to the Mirai owners in the form of exorbitant fees charged by the Department of Motor Vehicles for registration.

84.     Toyota sells thousands of Mirais to consumers with an array of incentives to their dealers for selling these cars, and Toyota enjoys unjust revenue and utilizes the data generated from consumers to their benefit.

85.     When customers complain or sue Toyota, points their fingers at the hydrogen stations or other actors for failures.

86.     Toyota had their boot on the necks of each hydrogen station operator.

87.     Toyota's monopolistic conduct violates the antitrust laws and harms consumers.

88.     Toyota is the dominant player in the Hydrogen Fueling Market, and has engaged in predatory and exclusionary conduct in furtherance of their monopolization, causing claimant to suffer substantial economic injury as a result of Toyota's competition reducing violations of law.

89.     This action seeks recovery for claimant's losses, as a taxpayer and Mirai owner, extract Toyota's unlawful gains, and other appropriate equitable relief to prevent Toyota from continuing to leverage its market position, as the largest car manufacturer in the world and by far the largest hydrogen fuel car manufacturer in the world, to harm California consumers.

**COMPLAINT FOR DAMAGES**

90.     But for Toyota's anticompetitive practices, claimant would have had more options in the fueling stations for his Mirai and other manufacturers would have likely created more hydrogen or vehicles for consumers.  Those companies would have created fueling station options and vehicles that competed with Toyota on the merits of *clean hydrogen*, without being dependent on Toyota for sustainability. Because Toyota anticompetitively restrained competition in its efforts to obtain a monopoly on the hydrogen retail marker, competition was foreclosed. Ultimately, consumers suffered, and continue to suffer, as a result of Toyota's wantonly anticompetitive harmful conduct.

91.     Toyota and First Element have systematically exploited their dominant market position in the hydrogen retail market to engage in a deceptive and manipulative pricing scheme, artificially inflating the true cost of hydrogen cars and hydrogen fuel and reaping profit. Their predatory practices drive up the price of hydrogen fuel and prevent consumers from obtaining fuel.

92.     The artificial suppression of other hydrogen stations and pricing manipulation is evidenced by the Mirai's lack of resale value, which consistently is less than 90% of the original purchase price. This stark disparity between the initial cost and the residual value reveals that the advertised price is not the true value of the vehicle.

93.     Toyota also fails to tell consumers that none of the parts needed on the hydrogen supply chain side or their retail side are in the United States, so if a pump needs heavy maintenance it could take months to even get the part made and shipped let alone installed and fixed.  Same with their Mirai.

94.     Toyota also along with True Zero deliberately built stations in rich neighborhoods and sold the car to low-income people like Claimant, making it more difficult for him to obtain fuel.

95.     Toyota continues to sell the car despite the crumbling infrastructure, exacerbating problems for Claimant.

**COMPLAINT FOR DAMAGES**

## <u>TOYOTA SALES REPRESENTATIVE LIES TO CLAIMANT</u>

96.    Claimant, as denoted in his accompanying declaration attached as Exhibit B was lied to in the following ways:

97.    Claimant had heard about the "ridiculously good" deal for the Mirai in the news and contacted Toyota Santa Monica to inquire about availability.

98.    After confirming availability, Claimant purchased the vehicle the following day.

99.    Claimant recalls asking the representative on the phone about the real range of the Mirai and being told it was approximately 350 miles.

100.    The salesperson informed Claimant of hydrogen stations in Santa Monica, Playa del Rey, Fairfax, and LAX and assured Claimant that hydrogen availability would improve and prices would decrease.

101.    Shortly after purchasing the Mirai, Claimant realized there were issues with fueling.

102.    During the first attempt to refuel, the nozzle got stuck on the car. A few months later, the LAX station was permanently closed, Fairfax was shut down for over six months for improvements, and Playa del Rey has been non-operational for about a year.

103.    Toyota knew there were issues with fuel availability, but despite having only one operational station remaining, they continued selling the vehicle.

104.    Even though Mirai owners, including Claimant, regularly contacted Toyota about the lack of available fuel, Toyota continued selling the car, further exacerbating the problem.

105.    Claimant recalls being told by the salesperson that the deal was so advantageous that Toyota essentially "paid them to drive the car." This may have been true had the price of hydrogen remained at $13 per kg and the resale value of the Mirai had not significantly depreciated.

**COMPLAINT FOR DAMAGES**

106.   Claimant initially thought purchasing the Mirai was like "winning the lottery," but soon found themselves in a nightmare situation. Claimant recalls being told by the salesperson that when the fuel card funds ran out, he could trade in the vehicle and obtain a certified pre-owned (CPO) model at a similar price with a new $15k fuel card.

107.   Claimant encountered a dispute with a rental company regarding gas reimbursement, which has resulted in an unresolved debt of $200 that remains outstanding.

108.   The financial burden of car ownership, compounded by medical debt, has led Claimant to contemplate filing for bankruptcy and has intensified his desire to rid themselves of the vehicle.

109.   Claimant attended a hydrogen leadership summit two years ago, where many attendees expressed skepticism about the viability of hydrogen-based technology, primarily due to its reliance on government subsidies and the high costs associated with production.

110.   Claimant has had negative experiences with the hydrogen fuel cell vehicle (FCV) program in California, noting that the high costs associated with the program, which is subsidized by both government and private entities, have not led to widespread adoption of FCVs.

111.   During travels in Poland, Claimant noted the absence of private owners of hydrogen fuel cell vehicles (FCVs), despite government subsidies promoting the technology.

112.   Claimant was forced to stop making payments on the Toyota Mirai due to mounting medical debt and the high costs of maintaining the vehicle. Claimant recommends alternatives like Tesla, Polestar, or Rivian, which he believes offer more reliable and efficient driving experiences compared to hydrogen fuel cell vehicles.

**COMPLAINT FOR DAMAGES**

113.   Claimant's experiences with the Toyota Mirai have led them to conclude that the infrastructure for hydrogen fueling is insufficient and unreliable, making it a less viable option compared to electric vehicles.

114.   Claimant has also observed that electric vehicle charging stations are far more accessible and convenient than hydrogen fueling stations, which are scarce and contribute to range anxiety for hydrogen vehicle owners. The ongoing issues with the Mirai's fueling nozzle have not only caused frustration but have also raised safety concerns about the refueling process.

115.   Claimant believes that the future of sustainable transportation lies more in electric vehicles than in hydrogen fuel cell technology, largely due to advancements in battery technology and the growing network of charging infrastructure.

116.   Claimant's decision to transition to a Polestar battery electric car was based on extensive research and discussions with other electric vehicle owners, who reported positive experiences with reliability, maintenance, and overall satisfaction. Additionally, Claimant has faced challenges with a rental car company, which required them to use a personal credit card for a vehicle rental, with reimbursement taking several months.

117.   An unresolved amount of over $200 is still pending. Claimant's interactions with the rental company left him feeling overwhelmed, particularly as he navigated medical appointments and the complexities of the reimbursement process. Feedback from professionals at the hydrogen leadership summit reinforced Claimant's belief that significant investment in hydrogen technology is unsustainable due to its dependence on government support and skepticism from financial institutions.

118.   The most significant aspect of Claimant's situation is that he purchased the Mirai specifically for work, primarily to drive for Uber, Lyft, and HopSkipDrive. In 2021, while finishing his studies at Santa Monica College and

**COMPLAINT FOR DAMAGES**

preparing to transfer to Cal State Long Beach, Claimant needed a flexible job to support themselves while attending school. Unfortunately, the Mirai's unreliability, particularly in fueling, left Claimant unable to work for days or even weeks, forcing them to rely on credit cards to cover expenses.

119.   Claimant continues to carry this debt, along with medical debt and over $20,000 owed on the Mirai. After graduating from Cal State Long Beach in May 2023, Claimant began a position as a Student Professional Worker at the LA County District Attorney's Office. However, due to the lack of reliable transportation, Claimant missed work several times and had to rent vehicles, eventually resigning from the position. Claimant spent countless hours discussing these issues with Toyota, but due to the Mirai's unreliability, he was forced to leave his job at the District Attorney's Office, derailing his career.

120.   Claimant is now a graduate student at UC Irvine, studying Criminology, Law, and Society. Claimant has stopped paying for the Mirai and other debts, prioritizing basic necessities like housing and food. Claimant currently receives food stamps to help cover these needs. A friend helped Claimant obtain a Polestar electric vehicle, as his damaged credit history prevented them from leasing a car.

121.   Claimant now drives children to school for additional income and is working toward becoming self-sufficient. For a long time, Claimant felt embarrassed by his financial situation and withdrew socially. After becoming a U.S. citizen in March 2024, Claimant is determined to fight for justice in his case against Toyota.

## FIRST CLAIM

### Violation of the Sherman Act 15 U.S.C. § 2 (Tying)

122.   The Sherman Act prohibits "monopoliz[ation] of] any part of the trade or commerce.  15 U.S.C. §2.

**COMPLAINT FOR DAMAGES**

123. As detailed above, Toyota has unlawfully tied their Mirai to the First Element fuel through their fuel card. A market exists for both the tying (hydrogen retail car) and tied (hydrogen fuel) products respectively.

124. Toyota has sufficient economic power in the tying market, the hydrogen retail car market, to affect competition in the tied market, hydrogen fuel. Toyota intentionally engages in predatory, exclusionary, and anticompetitive conduct with the design, purpose, and effect of unlawfully maintaining their market and monopoly power.

125. The availability of the Mirai is conditioned on consumers purchasing fuel from Toyota. Consumers are coerced into purchasing fuel from Toyota by virtue of wanting to purchase the Mirai. This is anticompetitive tying conduct. This is exacerbated by the fact that consumers have no clue this is happening in the background and that their car will be reduced in value by 90% the second after they buy the car and fuel prices are raised.

126. Toyota has sufficient economic power in their markets to coerce consumers into purchasing the hydrogen fuel that they steer consumers to and their conduct affects a substantial amount of commerce.

127. Toyota used their market power to manufacture harmful hydrogen to the environment contrary to the state and taxpayers goals and desires.

128. Claimant was harmed and Toyota's violation of the Sherman Act was the factor in causing this harm.

## SECOND CLAIM

### Violation of the Cartwright Act Cal. Bus. & Prof. Code, § §16720 16727

129. Toyota's acts and practices detailed herein violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce, or to prevent market competition. (Cal. Bus. & Prof. Code, §§ 16720, 16726.).

**COMPLAINT FOR DAMAGES**

130.   Toyota's acts and practices detailed herein violate the Cartwright Act, Cal. Bus. & Prof. Code § 16727, which makes it "unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." (Cal. Bus. & Prof. Code, § 16727.).

131.   Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

132.   The Cartwright Act also makes it "unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." (Cal. Bus. & Prof. Code, § 16727.)

133.   As detailed above, Toyota unlawfully tied their Mirais to their debtor First Element or other approved fueling stations.

134.   Defendants have sufficient economic power in the tying market to affect competition in the tied market.

- 18 -
**COMPLAINT FOR DAMAGES**

135.   The availability of the Mirai is conditioned on customers purchasing fuel from Defendants. In other words, consumers are coerced into purchasing fuel from Defendants by virtue of wanting to purchase the Mirai.

136.   The tying product, the Mirai, is separate and distinct from the tied products, the fuel required to be purchased by consumers because consumers such as Claimant has alternative options for the fuel and would prefer to choose among them independently from their decision to purchase Mirais. Toyota's unlawful tying arrangements thus tie two separate products that are in separate markets.

137.   Toyota has sufficient economic power in the market for to coerce consumers into purchasing fuel from Toyota.

138.   Toyota also uses their market power to misuse taxpayer funds.

139.   Claimant was harmed and Toyota's violation of the Carwright Act was a substantial factor in causing this harm.

## THIRD CLAIM

### Monopolization of Retail Hydrogen in Violation of the Sherman Act § 2

140.   Toyota has willfully acquired and maintained monopoly power in the relevant Hydrogen Retail Market. Toyota, is the largest car manufacturer and by all measures the largest hydrogen fuel car manufacturer has the power to control prices and exclude competition in both the Hydrogen Retail Vehicle Market and Hydrogen Retail Fuel Market.

141.   Toyota has willfully acquired and maintained monopoly power in the Hydrogen Retail Vehicle Market and the Hydrogen Retail Fuel Market by means of predatory, exclusionary, and anticompetitive conduct. Such conduct includes, but is not limited to: (a) engaging in a scheme to exclude hydrogen stations from entering the market (b) weaponizing its market position to retroactively impose standards (c) market the vehicle as green when it's not (d) illicitly obtain taxpayer funds to further its goals (f) obtain data from consumers by means of deception.

**COMPLAINT FOR DAMAGES**

142.   Toyota's destruction of competition caused antitrust injury to claimant by lobbying for taxpayer funds, misusing taxpayer funds, eliminating meaningful competition, pollution the environment in the name of helping the environment and continuing to maintain its dominance to sell and profit off California consumers.

143.   Toyota wasted taxpayer funds by preventing Cal State LA from selling hydrogen to consumers for seven years.

144.   There are no legitimate pro-competitive or business justifications for the conduct alleged herein, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

145.   Toyota's acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

146.   Toyota's conduct has had a substantial effect on interstate commerce..

147.   Claimant was, and will continue to be, injured in his personal property as a result of Toyota's conduct.

148.   Claiamnt has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) higher costs for fuel; (b) depreciation of their vehicles; and (c) wasted taxpayer funds (d) more pollution.

149.   Claimant seeks an award of treble damages or, in the alternative, disgorgement of Toyota's ill-gotten gains as it pertains to his car payments. Claimant also seeks appropriate equitable relief to enjoin Toyota from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Toyota's monopolization of the Hydrogen Fuel and Vehicle Markets has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Toyota to stop selling their

**COMPLAINT FOR DAMAGES**

hydrogen vehicles to consumers (c) for Toyota to return all taxpayer funds and benefits they received or caused to be generated.

## FOURTH CAUSE OF ACTION

### Fraud

150.   Claimant was lied to as explained above and in Claimant's declaration with express promises about 300+ mileage range which was never achieved from the outset, ease in fueling, upcoming additional local fueling opportunities, false information about where fuel is available, and the eco friendliness of the car.

151.   Toyota sales agents knew these representations were false.

152.   Toyota knew that Shell and other hydrogen fuel providers had closed its stations and were generally not nearly as reliable as gas stations and failed to disclose this to Plaintiff and actively concealed this information during the buying process.

153.   Toyota knew that the mileage range of over 350 miles was not possible.

154.   Toyota knew that the nozzle frequently freezes on the car and chose not to warn Plaintiff about this material difficulty in refueling.

155.   Toyota knew that fuel prices would not become cheaper for Claimant.

156.   Toyota knew the car is not good for the environment despite marketing it as such.

157.   Toyota failed to tell Claimant that if he got the vehicle serviced at a dealership not designated for Mirai service (only a couple Toyota dealerships service the Mirai) then the warranty would be voided.

158.   Toyota fails to tell Claimant that it uses the Mirai to collect and sell a tremendous amount of his personal data to insurance companies.

159.   These lies are material as Claimant would not have purchased the car without these lies.

**COMPLAINT FOR DAMAGES**

160.   Claimant relied on Toyota's brand and Toyota's representations regarding the Mirai.

161.   Claimant is damaged in that he made an expensive purchase that he cannot use or sell.

## FIFTH CAUSE OF ACTION

### Breach of Warranty of Merchantability

162.   California's Lemon Law (Cal. Civ. Code, section 1791.1(a).) holds that the Mirai would need to: (1) Pass without objection in the trade (2) Be fit for the ordinary purposes for which such goods are used (3) Be adequately contained, packaged, and labeled. (4) Conform to the promises made.

163.   Under the California Lemon Law a.k.a. Song-Beverly Consumer Warranty Act, the Mirai is a "consumer good" purchased primarily for family or household purposes and claimant used the vehicle primarily for those purposes. Claimant is a "buyer" of consumer goods under the California Lemon Law.

164.   The foregoing defects and nonconformities to warranty manifested themselves within the applicable express warranty period. The defects and nonconformities substantially impair the use, value and safety of the Mirai.

165.   No authorized repair facilities are able to conform the Toyota Mirai to the applicable express warranties, like the mileage range.

166.   By failure of Toyota to remedy the defects as alleged herein, or to issue a refund or replacement, Toyota is in breach of its obligations under the California Lemon Law.

167.   Claimant is entitled to justifiably revoke acceptance of Toyota Mirai under the California Lemon Law.

168.   Under the California Lemon Law, Claimant is entitled to reimbursement of all payments made towards the Mirai.

169.   Claimant is entitled to damages resulting from Toyota's failure to comply with its obligations under the California Lemon Law.

170.   Specifically, under the California Lemon Law Toyota has an affirmative obligation to offer to repurchase or replace the Mirai after Toyota was unable to repair the defect within a reasonable number of attempts. However, Toyota failed to offer to repurchase or replace the Mirai, and misrepresented to Claimant that it had no such obligation.

171.   Toyota breached warranties in that the Mirai was not of merchantable quality and not fit for its intended use.

172.   Toyota breaches warranties made to consumers with advertisements that the car achieves 300+ miles per tank when it does not.

173.   Toyota breaches warranties by having Claimant return to dealerships for numerous recalibrations to the vehicle after they could not drive the vehicle for many miles for personal use.

174.   The Mirai's multiple defects make it more than likely for Claiamnt to use the vehicle with inconvenience, failure, and mechanical breakdown.

175.   The Mirai was delivered to Claimant with serious defects and nonconformities to warranty.

176.   The foregoing defects and nonconformities to warranty manifested themselves in the Mirai within the applicable express warranty period.

177.   Nonconformities substantially impair the use, value, and safety of the Mirai.

178.   Toyota has failed to either promptly replace the new motor vehicle or to promptly make restitution in accordance with the Song-Beverly Act.

179.   By failure of Toyota to remedy the defects as alleged above or to issue a refund or replacement vehicle, Defendants are in breach of their obligations under the Song-Beverly Act.

180.   Claimant is entitled to all incidental, consequential, and general damages resulting from Toyota's failure to comply with its obligations under the Song-Beverly Act.

**COMPLAINT FOR DAMAGES**

181.   Claimant is entitled under the Song-Beverly Act to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees, punitive treble damages reasonably incurred in connection with the commencement and prosecution of this action.

182.   Because Toyota willfully violates the Song-Beverly Act, Claimant is entitled, in addition to the amounts recovered, a civil penalty of up to two times the number of actual damages for Toyota's willful failure to comply with its responsibilities under the Act.

## **PRAYER FOR RELIEF**

183.   Wherefore, Claimant pray for judgment as follows:

184.   Rescission of the contract.

185.   Refund of downpayment, car payments,

186.   Refund of insurance and DMV registration payments

187.   For treble damages as permitted under the anti-trust laws and Sing Beverly Act.

188.   For punitive damages;

189.   For reasonable attorney's fees and costs of suit;

190.   For other further relief as the Arbitrator may deem just and proper.

Dated:  September 16, 2024                      THE INGBER LAW GROUP


                                              */s/ Jason M. Ingber*
                                              Jason M. Ingber, Esq.
                                              Attorneys for Claimant

**COMPLAINT FOR DAMAGES**

# EXHIBIT A

## DECLARATION OF MICHAEL G. DRAY, ESQ.

1.    My name is Michael Gerard Dray, and I submit the following to be true under penalty of perjury per the laws of California based on my personal knowledge and observations as a public employee.

2.    I have roots in new energy technology.  For 12 years I operated an experimental waste to energy conversion plant for the City of Columbus Refuse and Coal Fired Municipal Electric plant.  I served as a 1st class steam operating engineer in Ohio, which permits me to operate any powerplant in Ohio that produces non-nuclear energy.

3.    I have a Bachelor's Degree from Capital University in Columbus, Ohio with a major in political science and minor in chemistry which I earned in 1992; and I earned my Juris Doctor from Capital University Law School in 1999 and I became a member of the Ohio state bar in 1999.

4.    I practiced law as a solo general practitioner in Ohio for six years.  My work included a variety of family, criminal, labor and employment and contract formation.

5.    My wife is a biochemist and she was offered a job as a professor and in Cal Poly San Luis Obispo, which she accepted.

6.    We moved to California in 2007.  While studying for the California bar exam in San Luis Opsbo I held a job with Aerotech Engineering which fabricated drones.  I passed the California bar and earned admission to practice throughout state and federal courts in California.

7.    My wife soon thereafter received a job offer from Cal State Los Angeles in a management and hiring at the University, and she accepted, so we moved to Pasadena/Los Angeles where we have lived since.

8.    For the next two years, I worked for the oil company Conoco Phillips in their Long Beach office for real estate, property tax, right of way, and claims department.

- 1 -
**DECLARATION OF MICHAEL G. DRAY, ESQ.**

9.      Around this time, I became aware through my wife that the University was having trouble getting their hydrogen station to be operational and that they were looking to hire someone to be the project manager for their hydrogen station.

10.     The University is publicly funded.

11.     The University received a two and a half million-dollar grant from the California Air and Resources Board to build a hydrogen station. The University spent its own funds and said grant to bring the station to fruition for a total of over $5 million.

12.     Additional philanthropic funds and other university funds were used to purchase the land and to fund this initiative. The University couldn't get the hydrogen station to work properly, because the pumps experienced unscheduled pulsations and vibrations. These pressure issues prevented the OEMs or auto-manufacturers from authorizing the University pumps. General Motors brought a prototype car for the University to test the pumps on and documented the inconsistent pressure.

13.     I applied for the job to fix the hydrogen station in late 2012 and was hired in March 2013 as the founding hydrogen station manager of operations and marketing.

14.     My official job title was: Technical Operations Manager College of Engineering Computer Science and Technology and Hydrogen Research and Fueling Station. I had a staff of about five technicians and employed 8-10 student engineers.

15.     My first order of business was to attend a national conference in Washington, D.C. for a Department of Energy Conference. I shared the issues at the University station with preeminent hydrogen industry leaders and I met with approximately six engineers at that conference, and they told me about their opinion on how to correct the hydrogen station. It was a unanimous consensus among the various experts that we needed to install a high-pressure buffer tank to fix the uneven pulsations occurring at each fueling event.

16.     After the Department of Energy conference, I returned to campus and put plans into place to procure said high-pressure buffer tanks and hire contract workers.

- 2 -
**DECLARATION OF MICHAEL G. DRAY, ESQ.**

17.     The general contractor who built the station was refusing to fix it even though his original drawings included a buffer tank; at this point the station was two to three years behind schedule.

18.     The tanks were eventually purchased and flown from Vienna, Austria. At an expensive $20,000 shipping cost and over $100,000 to install.

19.     It took me one year to turn the University's land and existing infrastructure into an operational hydrogen station.

20.     The installation of the buffer tanks was successful; it completely eliminated the pulsation issues that the OEMs had expressed concerns about.

21.     General Motors returned to the University and confirmed that the pulsation issue was fixed.

22.     Next, General Motors raised another issue, which was a fire safety issue: under the fire codes, specifically the NFPA (National Fire Protection Act) hydrogen technology fueling fire code number 52, during a fueling with hydrogen, the process must be paused periodically to monitor pressure loss in the lines going into the cars because any such pressure loss indicates there's a leak in the lines, and this is a testing requirement from the from the State Fire Marshall.

23.     It took us a year to fix this problem.  Throughout this time General Motors would send vehicle prototypes for us to test our station.

24.     I recognized that this needed to be addressed and would require reprogramming of the hydrogen dispenser, so I sought out and received a waiver from the California State Fire Marshall, whereby the Fire Marshall visited the station and we discussed the issues and they agreed that the University would be allowed to fuel cars notwithstanding this deficiency if the station attendants performed the fueling for customers and we monitored for hydrogen leaks with a handheld hydrogen detector. This allowed me to negotiate out ability to be safe and protect against leaks.

- 3 -
**DECLARATION OF MICHAEL G. DRAY, ESQ.**

25.     Once the State Fire Marshall approved our temporary fix to handheld test for Hydrogen leaks, Honda and Hyundai agreed to send some cars over to test the station.

26.     Soon thereafter, Hyundai allowed their customers to fuel at the University station and the University sent invoices to the OEMs which reimbursed the University.

27.     Throughout 2014, I personally sent these invoices monthly which included VIN of each vehicle and Hyundai had repaid the University significant sums.

28.     We were not yet certified by the California Department of Weights and Measures for accuracy (we obtained this certification in 2015) as to fuel pumped versus fuel charged, but Hyundai was paying for the fuel so it was of no consequence to the consumers.  We achieved the first certification from the Department of Weights and Measures in 2014.

29.     In the midst of these obstacles and achievements there was a meeting of the California Fuel Cell Partnership[1] at the Torrance Shell hydrogen station.

30.     A topic of discussion was Toyota had raised a prerequisite from their perspective of requiring fuel pumps to accept credit cards.

31.     At the meeting in Torrance, I raised the issue that as a station operator, it seems obvious that the method of payment should be controlled by the station operators not the auto makers.  I specifically stated that "…as a matter of fact, I believe if I want to accept a crate of chickens for hydrogen that is up to the operator…" but despite my protestations the California Fuel Cell Partnership and the members therein decided to impose, and  Hyundai and Honda acquiesced by silence, to this new requirement for a credit card reader to be on site.

32.     Toyota had the majority of the hydrogen cars on the road, and I believe the CA Fuel Cell Partnership charged membership dues based on how large the company was, so Toyota had a de facto veto at these meetings.

---

[1] The CA Fuel Cell Partnership was at first a cooperative organization that had the stated goal to uniformize the hydrogen retail standards but it quickly became closely tied to Toyota's needs.

- 4 -

**DECLARATION OF MICHAEL G. DRAY, ESQ.**

33.   I installed a credit card reader in the University station control room.

34.   Toyota refused to send any cars or staff to visit the hydrogen station.

35.   After the University achieved the certification from the Department of Weights and Measure Toyota continued to refuse to visit the University station or provide any cars to the University to test the station.

36.   At the next meeting after the University achieved the certification from the department of weights and measures   at one of the CA Hydrogen Partnership meetings, Spencer Quan who worked for and represented Toyota at these meetings said to me, "you have a lot of guts to declare yourself open to public" to which I responded something of the effect of "but I am, I have Fire Marshall approval, state certifications and building occupancy permits to sell hydrogen."

37.   Toyota then advocated for the University to be taken off the h2fcp.org website (the site that advised drivers which stations were available). I received phone calls from state officials that convinced me not to fight over this removal as it would be temporary.

38.   Next Toyota insisted that our University station, and all stations, meet a new fueling protocol.  A new fueling protocol that had never been pronounced as a perquisite and one that the University station was never built to meet.  The protocol was called the SAE (Society of Automotive Engineers) J2601, which stipulated for a control scheme which the station was not built to achieve, and Toyota knew this.

39.   So I endeavored to meet this new retroactive harsh standard over the course of the next two to three years.  My endeavors involved hiring a former JPL engineer and marshalling several contract vendors and coordinating an epic attempt to satisfy Toyota.  My endeavors also included the expenditure of several hundred thousand dollars of tax payer money. I was forced to spend money given to me by the California energy commission under a maintenance grant; forced to spend that money to make material modifications to the station and not deal with maintenance, and those funds had been earmarked for maintenance.

**DECLARATION OF MICHAEL G. DRAY, ESQ.**

40. All this time Toyota refused to send the University a car to test our progress or station.

41. Toyota also explicitly refused to lease a car to me, and again they refused to ever provide a car to assist with tuning the station to their specifications.

42. We created/commissioned with taxpayer money to test their testing standards on our station. This was a device called the Hystep: a million-dollar test device that the state had constructed to test fueling stations to meet SAEJ2601.

43. I along with my team helped the state get a testing device running so that we can be tested. Again, there was not even a testing device available in the world to meet the rigorous testing demands of Toyota.

44. Thereafter we modified the station further and we passed the testing to the best of our abilities. The University station was not built to cool hydrogen to minus 40 degrees and Toyota said it was ok to be minus 20 degrees instead of minus 40 degrees which just meant that they would perform the fueling slower.

45. For the better part of a decade, Toyota continued to impose outrageous and never-ending new regulations. For example, suddenly Toyota request that the station needs to be open 24/7. Toyota began to protest the University station saying it wasn't big enough. I advocated for the need for an attendant at the University station because of my awareness of the importance to have boots on the ground due to constant glitches but this was contrary to the model Toyota was pushing.

46. Again, Toyota had total control in prohibiting the customer from using the University station because they did not allow the fuel card to work at the University station or provide reimbursements.

47. I gave my cell phone number to the drivers, and people would call me every day early in the morning or on weekends, and I'd make fueling reservations for people and accommodate desperate drivers so when they came I had their names written down and fuel saved for them. Over the years I fueled thousands of cars and would help out Toyota drivers in the ways I could. At some point I was fueling

**DECLARATION OF MICHAEL G. DRAY, ESQ.**

experimental buses and selling hydrogen by filling trailers by what we're producing after Toyota had excluded customers for so many years; Toyota raised it in meetings that they wanted the fuel station to only service cars light weight cars which I refused to do based on free market principles: we can sell hydrogen to whoever we want as long as they're paying as long as there's fuel and its safe.

48.  Even the dealerships couldn't fuel the cars.  There were many times that Longo Toyota would beg the University station for fuel because the cars they were selling had run out of fuel and they couldn't refuel them.

49.  Around 2017 I informed the governor's office about the unrelenting control Toyota was exerting on us.

50.  It was my impression, that newly built stations by First Element were rapidly approved.  In my opinion Toyota went out of their way to help First Element. To my knowledge, Toyota had at least one "consultant" working full time in First Element to observe and report on First Element's operations to some degree.  Thus, I suspected that a creditor for First Element was at the very least observing them, if not actually policing their movements.

51.  The hydrogen stations throughout California in general have suffered greatly because of immature supply chains and fly by night vendors: manufacturers who are not invested or don't have a reputation to protect.  I had numerous times where I needed critical parts for the station and suppliers would flat out refuse to respond.

52.  In my opinion, Toyota's control on the hydrogen market had a chilling effect on other potential actors from entering the hydrogen market.

53.  In my opinion, Toyota sold too many hydrogen cars and overwhelmed the infrastructure and hydrogen supply.

Dated:  August 21, 2024                    MICHAEL G. DRAY, ESQ.

_____

- 7 -

**DECLARATION OF MICHAEL G. DRAY, ESQ.**

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                      CIVIL CODE § 1189

---

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Los Angeles_

On _08/21/2024_ before me, _Lindsey Schwartz Notary Public_
         Date                        Here Insert Name and Title of the Officer

personally appeared _Michael G. Dray, Esq._
                                Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

LINDSEY SCHWARTZ
COMM # 2360904
Los Angeles County
California Notary Public
Comm Exp June 12, 2025

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Lindsey Schwartz_
                Signature of Notary Public

Place Notary Seal Above

──────────────── OPTIONAL ────────────────
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _Declaration_  Document Date: _____
Number of Pages: _____  Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual        ☐ Attorney in Fact
☐ Trustee           ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual        ☐ Attorney in Fact
☐ Trustee           ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5907

# EXHIBIT B

## DECLARATION OF ALEX WILLIAMS

1.      I, Alex Williams, residing in Los Angeles, California, submit the following declaration under penalty of perjury, affirming that the statements made herein are true and correct to the best of my knowledge.

2.      I have owned a Toyota Mirai and have experienced significant issues related to the availability of hydrogen fueling stations as well as problems with the fueling nozzle.

3.      Due to the limitations of the Mirai, including the challenges with fueling and maintenance, I made the decision to switch to a Polestar battery electric car, which I find to be a more reliable option.

4.      Initially, I felt that I had secured a good deal with the Toyota Mirai; however, ongoing issues with the vehicle and its maintenance have led to unexpected costs and considerable frustration.

5.      I encountered a dispute with a rental company regarding gas reimbursement, which has resulted in an unresolved debt of $200 that remains outstanding.

6.      The financial burden of my car ownership, compounded by medical debt, has led me to contemplate filing for bankruptcy and has intensified my desire to rid myself of the vehicle.

7.      I attended a hydrogen leadership summit two years ago, where many attendees expressed skepticism about the viability of hydrogen-based technology, primarily due to its reliance on government subsidies and the high costs associated with production.

8.      I have had negative experiences with the hydrogen fuel cell vehicle (FCV) program in California, noting that the high costs associated with the program, which is subsidized by both government and private entities, have not led to widespread adoption of FCVs.

**BUYING EXPERIENCE AND AFTERMATH**

9.      I had heard about the "ridiculously good" deal for the Mirai in the news. I called Toyota Santa Monica and asked if they had the vehicle. After confirming availability, I went the next day and bought it.

10.     I remember asking the person on the phone what the real range of this car is, and he told me about 350 miles.

11.     The salesperson told me where the stations are in Santa Monica, Playa del Rey, Fairfax, and LAX. He definitely told me that the availability of hydrogen is only going to improve, and the prices will go down.

12.     I realized quickly after my purchase that there are issues with fueling itself. I remember my first time trying to get fuel, the nozzle got stuck.

13.     The LAX station was permanently closed a few months later, Fairfax was shut down for more than six months last year for some location improvements, and Playa del Rey has been empty for about a year right now.

14.     So, Toyota knew that there was an issue with fuel availability; from originally having 4 stations, I was left with only one last year.

15.     Even though we, the Mirai owners, were calling Toyota every day complaining about not being able to get fuel, they kept selling the car, creating even more problems.

16.     I also remember the salesperson telling me that this deal was so good that they basically "pay you to drive this car."

17.     That may have been true if the price of hydrogen stayed at $13 per kg, and the resale value of the Mirai would not go down almost to nothing.

18.     From thinking that I "won the lottery" with the Mirai, I quickly got into a nightmare phase.

- 2 -

**DECLARATION OF ALEX WILLIAMS**

19.     I remember the salesperson also told me that when I ran out of money on the fuel card, I would be able to trade in and take a CPO for a similar price to my own Mirai's value with the new $15k fuel card.

20.     I have observed issues with the reliability and maintenance of hydrogen fueling stations, as well as the high cost of hydrogen fuel, which I consider major obstacles to the success of this technology.

21.     During my travels in Poland, I noted the absence of private owners of FCVs, despite the government also heavily subsidizing this technology there.

22.     I have decided to stop making payments on my Toyota Mirai due to mounting medical debt and the high costs of maintaining the vehicle.

23.     I recommend considering alternatives such as Tesla, Polestar, or Rivian, which I believe offer a more reliable and efficient driving experience compared to hydrogen fuel cell vehicles.

24.     My experiences with the Toyota Mirai have led me to conclude that the infrastructure for hydrogen fueling is insufficient and unreliable, making it a less viable option for everyday use compared to electric vehicles.

25.     I have also observed that the convenience and accessibility of charging stations for electric vehicles far surpass those of hydrogen fueling stations, which are often few and far between, leading to range anxiety for hydrogen vehicle owners.  The infrastructure continues to decline.

26.     The ongoing issues with the fueling nozzle of the Mirai have not only caused frustration but have also raised concerns about safety and efficiency during the refueling process.

27.     I believe that the future of sustainable transportation lies more in electric vehicles rather than hydrogen fuel cell technology, primarily due to the advancements in battery technology and the growing network of charging infrastructure.

28.     My decision to transition to a Polestar battery electric car was influenced by extensive research and discussions with other electric vehicle owners, who have

- 3 -

**DECLARATION OF ALEX WILLIAMS**

reported positive experiences regarding reliability, maintenance, and overall satisfaction.

29.     Additionally, I have had challenges with a rental car company that required me to use my credit card for a vehicle rental, only to reimburse me several months later. This reimbursement process was frustrating, with an unresolved amount of over $200 still pending.  It may not seem like a lot but some months I'm just getting by, so it hurts as this is a totally unaccounted for financial setback and worry that now carries with me.

30.     My ongoing interactions with the rental company have left me feeling overwhelmed, especially as I navigated medical appointments and the complexities of their reimbursement process.

31.     The feedback I received from professionals at the hydrogen leadership summit reinforced my belief that significant investment in hydrogen technology may not be feasible due to its dependence on government support and the skepticism of banks regarding its viability.

32.     The most significant aspect of my situation is that I bought this car specifically for work primarily to drive for Uber, Lyft, and HopSkipDrive.

33.     In 2021, I was finishing up at Santa Monica College and preparing to transfer to Cal State Long Beach to pursue my Bachelor's degree. I needed a job with a flexible schedule that would allow me to attend university full-time while earning enough to support myself. Unfortunately, I quickly realized how unreliable the Toyota Mirai was for rideshare driving. I often found myself without fuel for days, sometimes even weeks during the summer. This left me without income, forcing me to rely on credit cards to cover basic expenses. I still carry this debt, along with medical debt and the over $20,000 I owe on the Mirai.

34.     In May of last year, I graduated from Cal State Long Beach and was offered a position as a Student Professional Worker at the LA County District Attorney's Office. I was thrilled to start a job related to my major in Criminology and

- 4 -

**DECLARATION OF ALEX WILLIAMS**

Criminal Justice, and I thought my life was finally improving. Unfortunately, things didn't go as planned. Last summer, there was no hydrogen available for months. I missed work several times and had to rent vehicles from Hertz or Avis using my own credit card while waiting for reimbursement from Toyota. The reimbursement process took months, which was extremely frustrating.

35.    I spent countless hours on the phone with Toyota, discussing the same issues repeatedly. Due to the lack of reliable transportation, I had to resign from my position at the District Attorney's Office in October last year, just six months after starting. This unreliable vehicle derailed my career in the field I was educated in, and I am still pursuing my education. I am currently a graduate student at UC Irvine, majoring in Criminology, Law, and Society. I began this program while still employed at the DA's Office. Now, I am trying to return to a position there, but it has been challenging. I currently work at American Airlines, where I am underemployed and overqualified for my role. I hope things will improve soon.

36.    At this point, I have stopped paying for the car and my other debts. My credit is already severely damaged, and my priority is ensuring I have a roof over my head and food on the table. Speaking of food, I am currently receiving about $200 in food stamps.

37.    A friend of mine helped me get a Polestar, a battery electric vehicle, as I couldn't lease a car with my damaged credit history. I am fortunate to have close friends who support me, as I have no family in the U.S. I've just started driving kids to school to earn extra money and hope to become self-sufficient and no longer rely on government assistance like food stamps. I chose the Polestar because I have easy and affordable access to charging at the university.

38.    For a long time, I felt embarrassed about my situation. I became very quiet and started avoiding people. The financial struggles caused by Toyota made me feel hopeless. I was also in the process of completing my immigration journey and obtaining naturalization, so I was afraid to take any legal action regarding this car,

- 5 -

**DECLARATION OF ALEX WILLIAMS**

1  fearing it might affect my naturalization process. Fortunately, I became an American

2  citizen on March 20, 2024. Now, I am determined to fight for justice in the Toyota

3  Mirai case.

4

5  Dated:  September 23, 2024                    ALEX WILLIAMS

6

7                                                              *Alex Williams*

8  _____

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 6 -
**DECLARATION OF ALEX WILLIAMS**